**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TERESA PRICE,** ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No. 09-1332** |
| ) | |
| **v.** ) | |
| ) | |
| **TRANS UNION, LLC** ) | |
| ) | |
| **Defendant.** ) | |

---

**PLAINTIFF TERESA PRICE'S MEMORANDUM OF LAW
IN SUPPORT OF HER RESPONSE IN OPPOSITION TO DEFENDANT
TRANS UNION, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

**FRANCIS & MAILMAN, P.C.**
JOHN SOUMILAS
GREGORY GORSKI
Land Title Building, 19th Floor
100 South Broad Street
Philadelphia, PA 19110
(215) 735-8600

## TABLE OF CONTENTS

I.      **INTRODUCTION**.................................................................................1

II.    **FACTUAL BACKGROUND**.........................................................3

     A.  TU Has Been On Notice Since 2001 That It Has Been Mixing Another Individual's Credit Information Into Plaintiff's Credit File. ........................................3

     B.  Plaintiff's 2005 And 2007 Disputes.............................................3

     C.  TU's Mishandling Of Plaintiff's March 2009 Credit File Dispute...............4

     D.  Summary Of Inaccurate Information Appearing On Plaintiff's Reports...............6

           1.  *Accounts Reported By TU Between 2001 And 2007 That "Did Not Belong" To Plaintiff Pursuant To TU's Own Records* ............6

           2.  *2008-2009 Public Records And Accounts Reported By TU That TU Corporate Representative Steven Newnom Identified As Inaccurate* ......7

           3.  *Personal Information Reported By TU And Identified As Inaccurate Appearing On Plaintiff's March 11, 2009 Report* ............7

           4.  *Regular Inquiries Reported By TU Identified As Inaccurate Appearing On Plaintiff's March 11, 2009 Report* ............7

     E.  TU's Twenty Year History Of Mixing Consumer Credit Files. ..................8

     F.  The "Do Not Merge" Procedure ...............................................13

     G.  TU Fails To Apply The "Do Not Merge" Procedure To Plaintiff's File ............15

     H.  Plaintiff Suffered Actual Damages As A Result Of TU's Conduct In The Form Of Lost Credit Opportunities, Damage To Credit Reputation And Emotional Distress....16

III.   **STANDARD** ..............................................................................18

IV.   **ARGUMENT** ...........................................................................19

     A.  TU's Contention That Plaintiff Cannot Prove An "Inaccuracy" Is Belied By Overwhelming Record Evidence, Plaintiff's Sworn Statements, And Even The Testimony Of TU's Rule 30(b)(6) Witness Steven Newnom..................19

     B.  Plaintiff Has A Valid Claim Under FCRA Section 1681i, Which TU Either Misconstrues Or Ignores. .......................................................23

C. TU's Challenges Of Plaintiff's FCRA Section 1681e(b) Claim Fail Because Plaintiff Has Come Forward With Evidence To Show A Genuine Issue Of Material Fact On The Subject Of Inaccurate Information Causes Plaintiff Damages....................................................................................................26

    1. *TU Does Not Even Challenge Plaintiff's Evidence Or Right To Recover Actual Damages For Credit Defamation*....................27

    2. *TU Does Not Even Challenge Plaintiff's Evidence Or Right To Recover Damages For Emotional Distress*....................31

    3. *TU's Challenge To Plaintiff's Lost Credit Opportunities Claim Fails For That Claim Presents A Genuine Issue Of Material Fact*..............33

D. Plaintiff Has Proffered Clear-Cut Evidence That TU's Violations Of The FCRA Were *Willful*...................................................................................38

    1. *The FCRA Willfulness Legal Standards*....................38

    2. *FCRA Recklessness Further Defined*....................39

    3. *Many Courts Have Held In FCRA Cases That The Jury Should Decide Whether A Defendant Acted With Reckless Disregard*..............40

    4. *Safeco's "Reasonable Reading" Language Regarding The Term "Increase" Under FCRA Section 1681m Is Not Helpful To TU*..............44

    5. *TU's Matching Procedures Also Provide No Defense To Plaintiff's FCRA Willfulness Claim Here*....................47

**V.**  **CONCLUSION** ....................................................................................49

## I.      <u>INTRODUCTION</u>

Plaintiff Teresa Price, an individual consumer, hereby respectfully responds in opposition to the Motion for Partial Summary Judgment filed by Defendant Trans Union, LLC ("TU") (Docket No. 37), a national consumer reporting agency or "CRA."   TU is primarily regulated under the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*  Plaintiff here claims that TU violated the FCRA by failing to follow reasonable procedure to assure the maximum possible accuracy of information on her credit report (as required by FCRA section 1681e(b)) and by failing to permanently correct inaccuracies in her credit file within 30 days of her disputes (as required by FCRA section 1681i).

TU has mixed Plaintiff's credit file with that of a stranger (also named Teresa Price) for the better part of the decade, despite receiving repeated notice of its false credit reporting in 2001, 2005, 2007 and 2009.  TU reported false personal identifying information about Plaintiff, at least 17 false accounts, at least 12 false credit report inquiries (or purported credit applications) and even falsely reported that Plaintiff had filed for bankruptcy and had two tax liens placed against her.  All of these inaccuracies stemmed from the same basic source -- TU's "mixing" of Plaintiff's file with that of another consumer.

TU is well aware of its "mixed file" problem, which has been the subject of regulatory enforcement and voluminous lawsuits and consumer complaints.  Its regular corporate representative in FCRA cases has stated under oath that TU believes that it should "avoid" and "eliminate" the problem of mixed files.   Despite having created a simple and cost-effective procedure (called a "do not merge" tag) designed to avoid mixed files, it fails to implement it -- and it repeatedly failed to use or implement the do not merge tag upon Plaintiff's credit file in this case for almost a decade.

As a result, TU seriously damaged Plaintiff's credit reputation and credit standing, caused her to lose credit opportunities and caused other credit-related losses. TU also caused her unnecessary embarrassment, humiliation, anxiety and emotional distress -- all of which are compensable as actual damages under the FCRA.

TU now moves for summary judgment, as it does as a matter of course in FCRA cases, trying the same tired arguments.[1] TU ignores most of the factual record in this case -- and instead points out where it actually corrected a few of the false accounts through the years, and where Plaintiff (weary of the volume of unknown credit information appearing on her credit report) actually disputed some unrecognized accounts that turned out to be hers. But the fact that TU did not get it completely wrong 100% of the time is no defense to an FCRA claim, and no basis for summary judgment.

When the actual facts and the correct legal standards that apply to this matter are set forth below, it will be apparent that the record here presents genuine issue of material facts and TU is not entitled to judgment as a matter of law. Significantly, the record shows that the following central issues are in dispute:

- Whether certain information that TU reported on Plaintiff's credit report was, in fact, "accurate" or "inaccurate";

---

[1]     TU has lost virtually identical arguments in the following cases: *See Cushman v. Trans Union Corp.*, 115 F. 3d 220 (3d Cir. 1997); *Philbin v. Trans Union Corp.*, 101 F.3d 957 (3d Cir. 1996); *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329 (9th Cir. 1995*); Dixon-Rollins v. Trans Union, LLC*, E.D. Pa. Civ., No. 09-0646 at Docket No. 49 (Savage, J.); *Anderson v. Trans Union, LLC*, E.D. Pa. Civ. No. 05-5683 at Docket Nos. 15 and 21 (DuBois, J.); *Baksh v. Trans Union, LLC*, E.D. Pa. Civ. No.  04-1088 at Docket Nos. 46 and 62 (Brody, J.); *Lawrence v. Trans Union, LLC*, 296 F. Supp. 2d 582 (E.D. Pa. 2003) (Brody, J.); *Crane v. Trans Union, LLC*, 282 F. Supp. 2d 311 (E.D. Pa. 2003) (Dalzell, J.); *Evantash v. Trans Union,* Civ. No. 02-1188, 2003 WL 22844198 (E.D. Pa. Nov. 25, 2003) (Davis, J.); *Sheffer v. Trans Union*, Civ., No. 02-7407, 2003 WL 21710573 (E.D. Pa. July 24, 2003) (Schiller, J.).

- The causes for the alleged inaccuracies -- with TU's own witnesses giving contradictory testimony about whether TU mixed Plaintiff's credit file -- which goes to the willfulness of TU's conduct; and

- The harm that TU's conduct actually caused to Plaintiff.

TU also misstates the applicable legal standards, repeatedly citing non-binding cases from other jurisdictions instead of the multiple decisions from within our Circuit (many against TU itself), which have previously addressed the credit reporting claims at issue here.  Under the proper legal standards, which will be set forth below, it is also evident that TU is not entitled to judgment as a matter of law in this case.  Accordingly, TU's Motion should be denied.

## II.    FACTUAL BACKGROUND

**A.    TU Has Been On Notice Since 2001 That It Has Been Mixing Another Individual's Credit Information Into Plaintiff's Credit File.**

TU has been mixing credit information belonging to another consumer for the better part of a decade.  TU's own witnesses and documents confirm that Plaintiff Teresa Price disputed the fact that TU was reporting information on her credit report that belonged to another individual with the "same/similar name" as early as November 2001.  *See* Ex. 1, TU Relevant Portions of Credit Disclosure & Dispute Line Item Regarding Commercial Services Group, dated November 23, 2001; Ex. 2, January 8, 2010 Deposition of Steven Newnom ("Newnom Dep."), at 42:11-45:7.  TU's own computer notes confirm, for example, that a highly derogatory collection account for Commercial Services Group with a balance of $5,027 was "removed from [Plaintiff's] credit report" on November 23, 2001 because the account "does not belong to consumer [Plaintiff]."  Ex. 1.

**B.    Plaintiff's 2005 And 2007 Disputes.**

Plaintiff was also forced to wage disputes with TU again in 2005 and 2007 after she saw more accounts on her TU credit report that did not belong to her.  *See* Ex. 2, Newnom Dep., at

45:18-48:22, 52:20-55:16; Ex. 3, TU Investigation Results, dated November 19, 2005 (deleting various accounts and verifying others); Ex. 4, TU Investigation Results, dated June 7, 2007 (deleting various accounts and verifying others).

In connection with these additional disputes, TU's own consumer relations notes again prove that TU itself, via its data furnishers responses, concluded that multiple accounts disputed by Plaintiff in fact "do[ ] not belong to [her]" and should be "removed from credit report." *See, e.g.*, Ex. 5, TU Dispute Line Item Regarding 2 Key Bank Accounts, dated October 21, 2005; Ex. 6, TU Dispute Line Item Regarding CBE Group Account, dated April 30, 2007; Ex. 7, TU Dispute Line Item Regarding Compucredit Corp. Account, dated April 30, 2007.  *See also* Exs. 3 and 4 (deleting two inaccurate Key Bank accounts, CBE Group account, and Compucredit Corp. account from Plaintiff's TU credit report).[2]

**C.     TU's Mishandling Of Plaintiff's March 2009 Credit File Dispute.**

Despite having warnings in 2001, 2005 and 2007 that it was including another person's credit information in Plaintiff's credit file, TU continued to substantially mix Plaintiff's credit file in 2009 and 2010.  By March 2009, Plaintiff credit file contained a bankruptcy, two state tax liens, two charged off credit cards (Bank of America & HSBC), a credit card included in bankruptcy (Capital One), an installment loan with a late payment history (Wachovia), two credit card accounts in good standing (Two Capital One & HSBC) and two installment loans (both Wilmington Trust) along with 12 false "inquires" (for purportedly new credit applications),

---

[2]      Although Plaintiff acknowledges that she previously disputed accounts on her credit report which she subsequently learned did belong to her, TU fails to disclose the full context in which Plaintiff disputed these items.  The accounts which Plaintiff was unable to distinguish as belonging to her were collection accounts.  Although these organizations reported the accounts to TU, they did not engage in any collection activity against Plaintiff in order for Plaintiff to realize that the accounts may actually belong to her.  Accordingly, Plaintiff's mistakes in this regard were more than understandable given that TU was concurrently reporting a myriad of inaccurate and derogatory information about her that belonged to another individual.

which Plaintiff did not initiate.  *See* Ex. 8, Plaintiff's Supplemental Responses to Interrogatories, at No. 3; Ex. 2, Newnom Dep., at 72:2-73:7.  All of these public records, derogatory accounts and inquiries belonged to the other Teresa Price.  *See id.*  Plaintiff learned that her TU credit file was still mixed when she was denied financing for a car that she wanted to purchase for her son. *See* Ex. 9, Declaration of Teresa Price ("Price Decl.").

Plaintiff promptly disputed to TU by telephone and advised TU's representative that her credit file was still horrendously mixed with derogatory information belonging to another Teresa Price.  *See id.*  Plaintiff further even advised TU that she had previously waged disputes with TU for this same reason and requested immediate deletion of anything on her report belonging to the other Teresa Price.  *See id.*

Notwithstanding the fact that Plaintiff's March 2009 dispute marked the fourth occasion that Plaintiff was forced to wage a dispute with TU because of this problem, TU grossly failed to address Plaintiff's concerns.  Plaintiff received investigation results from TU which advised that TU purportedly deleted only the bankruptcy from Plaintiff's credit file.  *See id.*  *See also* Ex. 10, TU Investigation Results, dated March 16, 2009.  TU did not investigate, delete or correct any of the other public records, accounts or information on Plaintiff's credit report belonging to the other Teresa Price.  *See* Ex. 9, Price Decl.

TU's mixing of Plaintiff's file, however, did not stop in March 2009.  In July 2009, after Plaintiff brought this lawsuit, Plaintiff's counsel was provided with a purportedly corrected credit report for Ms. Price in advance of the Rule 16 conference scheduled by the Court.  *See* Ex. 11, Plaintiff's Consumer Credit Report, dated July 13, 2009.  Not only was the majority of derogatory information belonging to the other Teresa Price still reporting (two tax liens, Capital One, HSBC and Wachovia), TU had actually reinserted the bankruptcy back onto Plaintiff's

credit file and even added six new credit card accounts that did not belong to Plaintiff (Bank of America, CBUSA/Sears, CreditCare/GEMB, Spirit of America National Bank, & TD Bank).[3] *See id.*

Trans Union's mixing of Plaintiff's file unfortunately continues beyond July 2009 as well.  TU received documents subpoenaed from HSBC in relation to a charged-off credit card account that was still reporting on Plaintiff's credit report more than seven months after this lawsuit was filed.  *See* Ex. 12, Relevant Portions of HSBC Document Production.  The documents from HSBC unambiguously revealed the account belonged to the other Teresa Price (now Teresa Webb).  *See id.*  Despite this definitive proof, TU continued to include that highly derogatory charged-off account on Plaintiff's credit file until January 2010.  *See* Ex. 13, TU Investigation Results, dated January 7, 2010 (finally removing HSBC account).

**D.      Summary Of Inaccurate Information Appearing On Plaintiff's Reports.**

In summary form, TU reported the following 37 items of inaccurate information on Plaintiff's report over the previous decade:

**1.      *Accounts Reported By TU Between 2001 And 2007 That "Did Not Belong" To Plaintiff Pursuant To TU's Own Records***

- Commercial Services Group - 2001 (Ex. 1)
- 2 KeyBank Accounts - 2005 (Ex. 5)
- CBE Group Account - 2007 (Ex. 6)
- Compucredit Corp - 2007 (Ex. 7)

---

[3]      TU's counsel provided Plaintiff's counsel with another credit file disclosure later that day presumably because counsel recognized that TU had again wholly failed to remove virtually all of the derogatory records and accounts belonging to the other Teresa Price from Plaintiff's credit file.  Even after providing Plaintiff's counsel with an updated credit file disclosure, TU still continued to report the inaccurate, derogatory charged-off HSBC account.

2.    **2008-2009 Public Records And Accounts Reported By TU That TU Corporate Representative Steven Newnom Identified As Inaccurate**

- Bankruptcy
- Kent County Tax Lien
- Kent County Release of Tax Lien
- Bank of America Credit Card  (Charged Off)
- HSBC Credit Card (Charged Off)
- Capital One Credit Card – Included In Bankruptcy
- Wachovia Installment Loan – Late Payment History
- 2 Capital One Credit Cards
- HSBC Credit Card
- 2 Wilmington Trust Installment Loans
- Bank of America
- CBUSA/Sears
- CreditCare/GEMB
- Spirit of America National Bank
- TD Bank

See Ex. 2, Newnom Dep., at 71:3-7; 72:2-73:7; *see generally id*. at 74:2-7.

3.    **Personal Information Reported By TU And Indentified As Inaccurate Appearing On Plaintiff's March 11, 2009 Report**

- Teresa L. Webb
- 17 Asbury Drive, Dover DE
- Employment – Country Eaterie – Waitress
- Employment – Confident Cleaners

See Ex. 8, at No. 2; Ex. 14, Plaintiff's Consumer Credit Report, dated March 11, 2009.

4.    **Regular Inquiries Reported By TU Identified As Inaccurate Appearing On Plaintiff's March 11, 2009 Report**

- Professional Recovery (7/08)
- Washington Mutual Cards (7/08)
- Mid Atlantic Capital (6/08)
- Wilmington Finance (6/08)
- Leading Edge Rec (3/08)
- Atlantic Credit (2/08)
- Firstsource Advantage (1/08)
- First USA (7/07)
- Johnson Controls (6/07)
- TD Bank (5/07)
- Capital One (4/07)

- National Enterprise (4/07)

*See* Ex. 8, at No. 3.  *See also* Ex. 14.

**E.    TU's Twenty Year History Of Mixing Consumer Credit Files.**

TU is no stranger to the problem of mixing consumer credit files.  As early as 1992, the

Attorneys General of seventeen states were forced to file a lawsuit against TU because of TU's

conduct in connection with mixing consumer credit files.  *See* Ex. 15, Consent Order, dated

October 26, 1992.[4]  In settling the enforcement action brought by the AGs, TU agreed to make

the following practice changes:

- "Implement or continue to utilize and maintain reasonable procedures to <u>avoid</u> the occurrence or reoccurrence of Mixed Files." (¶ G.1) (emphasis added);

- "Take reasonable measures to prevent reporting of information that is not likely to pertain to the Consumer who is the subject of the Report." (¶ G.4); and

- "Shall attempt to obtain Full Identifying Information from Consumers . . . and use Full Identifying Information when requesting Consumer Reports."[5] (¶ G.5).

*See id.* (emphasis added).  Accordingly, TU has been on notice of the mixed file problem for the

better part of two decades.

---

[4]    The relevant Consent Order defines for the first time a "Mixed File" as a "consumer report in which some or all of the information pertains to a person or persons other than the persons who is/are the subject of the Consumer Report."  *See id.* at ¶ F.10.  Lynn Romanowski, Senior Project Manager for TU, likewise defined mixed file as "an instance where there would be possibly indicative or credit information belonging to more than one consumer existing on a single file." *See* Ex. 16, July 10, 2009 Deposition of Lynn Romanowski, ("July 2009 Romowski Dep."), at 25:17-21.  Plaintiff's circumstance thus satisfies this definition precisely.

[5]    The relevant Consent Order defines "Full Identifying Information" as "last and first name; middle initial; full street address; zip code; year of birth; any generational designation; <u>and</u> social security number." *See id.*, at ¶ F.8 (emphasis added).

The regulations promulgated by the FTC regarding Section 1681e(b) even use a "mixed file" problem as the paradigm example of when a violation of this provision is implicated:

> when a consumer reporting agency learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise) it must review its procedures for assuring accuracy. Examples of errors that would require such review are the issuance of a consumer report pertaining entirely to a consumer other than the one on whom a report was requested, and the issuance of a consumer report containing information on two or more consumers (*e.g.*, information that was mixed in the file) in response to a request for a report on only one of those consumers.

16 C.F.R. pt. 600, App. (Part 3.A of commentary on § 607 of FCRA, codified at section 1681e(b)) (emphasis added).

TU by all accounts knows full well that mixed files are a significant problem.  Ms. Romanowski admits that mixing a consumer's information onto another consumer's file amounts to an inaccuracy, which TU is statutorily bound to avoid, and that all of the information on one consumer's credit report should be about that particular consumer and not someone else.  *See* Ex. 16, July 2009 Romanowski Dep., at 27:1-4; 28:12-16.[6]   Eileen Little, Priority Processing Manager for TU, testified as follows:

_____

[6]     The testimony of TU representatives in other cases about TU's FCRA-related procedures and policies is cited herein because it is clearly relevant to this action.  Since the present TU attorneys defended these depositions, and thus had a full and fair opportunity to develop the witnesses' testimony, and since the deposition testimony concerns substantially similar issues as those in the present case, the testimony is appropriate for purposes of this motion as it would be at trial.  *See* Fed. R. Civ.  P. 32(a); Fed. R. Evid. 801(d)(2)(D); *Crane v. Trans Union, LLC*, 282 F. Supp. 2d 311, 316 n.6 (E.D. Pa. 2003) (relying upon deposition of same corporate representative of consumer reporting agency given in another FCRA case); *Copeland v. Potroleum Transit Co.*, 32 F.R.D. 445, 447 (E.D.S.C. 1963) (deposition taken for use in another case could be used in instant case where substantially same issues were involved and defendant had adequate opportunity to cross-examine deponent with same motive and interest); *see also Gros v. City of Grand Prairie*, 181 F.3d 613, 619 (5th Cir. 1999) (relying on deposition testimony taken in another case to vacate summary judgment); *Donahey v. Wellman*, 687 F. Supp. 195, 196-97 (W.D. Pa. 1988) (relying on deposition taken in parallel case to grant summary judgment); *see generally Aileen Mills Co. v. Ojay Mills, Inc.*, 192 F. Supp. 131, 135

> Q.   Does TransUnion believe that it should avoid having information mixed into another person's file that does not belong to that consumer?
>
> A.  Yes, we do.
>
> Q.  Does TransUnion believe that it should eliminate mixed files?
>
> A.  Yes.

*See* Ex. 17, February 28, 2007 Deposition of Eileen Little ("February 2007 Little Dep."), at 25:17-23.  TU has even been sued repeatedly on account of having mixed consumer files.  *See*, *e.g.*, *Philbin v. Trans Union Corp.*, 101 F.3d 957 (3d Cir. 1996); *Cousin v. Trans Union Corp.*, 246 F.3d 359 (5th Cir. 2001); *Guimond v. Trans Union Credit Information Co.*, 45 F.3d 1329 (9th Cir. 1995); *O'Conner v. Trans Union Corp.,* Civ. No. 97-4633, 1999 WL 773504 (E.D. Pa. Sept. 29, 1999); *see also Thomas v. Trans Union*, C.A. No. 00-1150 (D. Or. 2002) (jury verdict of $5.3 million remitted to $1 million; $300,000 in compensatory damages for emotional distress damages in mixed file case); *Soghomonian v. Trans Union*, (E.D. Cal.) ($330,000 in actual damages, $660,000 punitive damages); *see also* Ex. 16, July 2009 Romanowski Dep., at 10:3-13:23 (discussing several mixed file lawsuits in which witness has been personally involved, including three that went to trial).

Despite these circumstances, TU's efforts to prevent the mixing of consumer credit files remains woefully inadequate.  Ms. Romanowski acknowledges that TU's computer database (CRONUS) is the source of mixed files:

---

(S.D.N.Y. 1960) (deposition taken in prior action by other plaintiffs against same defendants was part of record where submitted to district court upon motion to quash); *Tobacco & Allied Stocks v. Transamerica Corp.*, 18 F.R.D. 355, 356 (D. Del. 1955) (all depositions, exhibits and pleadings from analogous litigation offered by party, over objection of opponent, were accepted and considered admissible).

Q.  Would you agree with me that this combination of two or more files happens at TransUnion?

A.  Yes.

Q.  Okay.  It happens within the CRONUS database, correct?

A.  Yes.

Q.  In other words, it's not a malfunction, it's not as if the computer database goes haywire, correct?

A.  That's correct.

Q.  It's not as a result of malfeasance, someone breaking into the database and mixing up files, correct?

A.  That is correct.

Q.  It is part of how the database operates that at least sometimes files become mixed?

A.  Yes.

*Id*. at 29:3-30:4 (objections omitted).

Moreover, TU's computer system causes these mixes because TU, despite the 1992 Consent Order, permits a potential credit grantor to provided TU less than "full identifying information" of the consumer in order to sell more credit reports:

Q.  What is the minimum indicative information that TransUnion will require from the user of the credit report, such as a bank, before it sells a credit report to that entity?

A.  Generally it's the consumer's first name, last name and current address.

Q.  Okay.  The Social Security number is not required before a sale is conducted, correct?

A.  That is correct.

Q.  The date of birth is also not required, correct?

A.  Correct.

Q.  The name, first name could be a nickname, correct?

A.  Yes.

Q.  It could be just an initial, correct?

A.  Yes.

Q.  The first or last name does not need to match letter for letter, correct?

A.  Correct.

*Id*., at 42:14-43:9.  Thus, during an "inquiry" (or a purportedly new application for credit) TU could mix the files of two consumers with similar personal identifying information because it does not require full indentifying information.  With just a partial name and address, the TU computer can misidentify the consumer about whom the inquiry truly relates:

Q.  Is it typically the case that an online combine is a result of an inquiry on one of the two files that become merged?

A.  It's an inquiry that sparks an online combine, and it's an inquiry on the consumer whose files are merged.

Q.  Could you answer that one, whether "sparks" means "causes"?

A.  Yes.

Q.  Okay.  Is that what you mean by "sparks"?

A.  Yes.

Ex. 18, January 8, 2010 Deposition of Lynn Romanowski ("January 2010 Romanowski Dep."), 27:4-20.

TU also offers no reason to believe it has done anything to prevent mixed files since the 1992 Consent Order was entered.  Ms. Little indicated that TU still received multiple confirmed mixed file disputes from consumers on *a weekly basis*.  *See* Ex. 19, July 8, 2009 Deposition of

Eileen Little ("July 2009 Little Dep."), at 29:11-41:2.  Ms. Little also could not provide any information that suggests that the number of mixed file disputes had gone down since 1992 or that TU even attempts to keep track of whether mixed file disputes are receding.  *See id.*  On the contrary, and as an indicator of the depth of the problem, Ms. Little confirmed that TU employs approximately 1,000 representatives who are trained to deal with mixed file disputes.  *See* Ex. 17, February 2007 Little Dep., at 47:7-49:16.[7]

**F.       The "Do Not Merge" Procedure.**

TU's only remedy to mitigate the occurrence of a mixed file, which it will normally not employ until after a consumer disputes, is the "do not merge" procedure:

> Q.  In what circumstance is the do-not-merge procedure that you just testified about used to prevent the mixing of two files in the first place?
>
> A.  It's usually put in to prevent, if we know, like, a junior/senior situation, or if an individual may have proclaimed to be mixed with someone else.   We would initiate that so no further other information or two files would be combined together.

Ex. 2, Newnom Dep., at 75:22-76:7; Ex. 16, July 2009 Romanowski Dep, at 94:4-11. Ironically, the "do not merge" procedure works because it uses very strict matching criteria:

> Q.  Well, let me interrupt you.  What does it do?  How is it that it prevents files from remerging?

---

[7]       TU continues to have a mixed file problem, almost two decades after the Consent Order, because it deliberately chooses not to correct it.  TU would simply not be able to sell as many credit reports if it eliminated mixed files.  The analysis is rather simple: if TU requires every buyer of a credit report to enter the proper name, address, social security number and date of birth of the consumer to whom the report relates during the inquiry process (which TU controls), it would not be able to sell reports to those entities who do not have all that information -- entities that seek to make a quick sale, collect debts or promote credit to consumers who are not already their customers.   The tightening of TU's "file matching criteria" to require "full identifying information" would greatly reduce or eliminate mixed files, it would greatly improve accuracy, but it would also reduce the number of credit reports that TU could sell.

A.  When it's on a file, that file will not be permitted to merge with another file unless there's -- very strict criteria is met at that point.

Q.  Strict matching criteria?

A.  Excuse me.  Yes.

Q.  What type of strict matching criteria?

A.  For the most part, partial matches aren't permitted. Basically, for the fields that we'll look at, we'll require exact matches at that point then.

Q.  So when we are talking about this process of retrieving credit reports from the database in order to respond to a furnisher's inquiry, if a file has a do not merge tag on it, it's not going to merge with another file because the information is pretty close, correct?

A.  I'm sorry, you said when they inquire the file with the tag on it, that is correct, it will not merge with another file if it's determined to be pretty close, if that was your –

Q.  So what was -- you have termed it "partial matching" earlier in this deposition, right?

A.  Yes.

Q.  So you told me it's not a complete match on the Social Security number, but it could be one or two digits off depending on the circumstances, correct?

A.  Yes.

Q.  When the do not merge tag is on the file, will it require a digit-for-digit match for all nine digits of the Social Security number?

A.  Yes.

Ex. 16, July 2009 Romanowski Dep., at 95:14-96:24.  In other words, a "do not merge" tag requires something closer to true "full identifying information," which TU promised to employ in the 1992 Consent Order, during the inquiry process, *i.e.* the preparation and sale of a credit report to a third party.  *See* Ex. 15 at ¶ F.8 (defining "Full Identifying Information" as "last and

14

first name; middle initial; full street address; zip code; year of birth; any generational designation; and social security number") (emphasis added).

Mr. Newnom testified that the "do not merge" procedure only takes a few seconds, and involves the mere click of a button on a computer screen.  *See* Ex. 2, Newnom Dep., at 78:6-18. Ms. Romanowski even testified on TU's behalf that she has never seen the do not merge procedure fail in preventing mixed files.  *See* Ex. 16, July 2009 Romanowski Dep., at 97:2-23. Despite the existence of this procedure designed to correct the very problem plaguing Plaintiff's credit file, this procedure was not followed.

**G.     TU Fails To Apply The "Do Not Merge" Merge Procedure To Plaintiff's File.**

Ms. Romanowski admitted that Plaintiff's file was "combined" with the credit file of the other Teresa Price by TU's computer system at least on October 6, 2008 thus resulting in a mixed file.  *See* Ex. 18, January 2010 Romanowski Dep., at 40:9-41:2.  *See also* Ex. 20, October 6, 2008 Online Combing Log.  Putting aside TU's dreadful history of causing mixed files to occur, TU possessed an easy, simple, cost-effective and reliable solution to solve Plaintiff's mixed file problem, to wit, the "do not merge" procedure.

TU, however, inexcusably failed to apply a do not merge to Plaintiff's credit file.  *See* Ex. 2, Newnom Dep. at 78:21-80:10, 83:23-86:17.  Indeed, even after this lawsuit was filed, TU did not employ the use the "do not merge" procedure. *See id.*

> Q.   To this date as you sit here, you don't know whether TransUnion ever followed the do-not-merge procedure with respect to the plaintiff; correct?
>
> A.  Correct.
>
> Q.   You have no evidence whatsoever that TransUnion, in fact, followed the do-not-merge procedure; correct?
>
> A.  As selecting that information? No, I do not.

Ex. 2, Newnom Dep., at 79:15-80:1 (objections omitted) (as of Mr. Newnom's January 8, 2010

deposition in this matter).  Plaintiff further requested all documents from TU memorializing

whether the "do not merge" procedure was employed in connection with Plaintiff's credit file.

No documents were produced to show that TU followed the do not merge procedure in 2001,

2005, 2007, 2009, after this suit was filed, or to date.

**H.      Plaintiff Suffered Actual Damages As A Result Of TU's Conduct In The Form Of Lost Credit Opportunities, Damage To Credit Reputation And Emotional Distress.**

As articulated in Plaintiff's Supplemental Initial Disclosures and Supplemental

Responses to TU's Interrogatories, Plaintiff makes claims for actual damages here arising from

the loss of credit opportunities, injury to her credit reputation and for emotional distress deriving

from TU's conduct and her subsequent credit problems.  *See* Ex. 8, at No. 6e; Ex. 21, Plaintiff's

Supplemental Disclosures.

Plaintiff several times was unable to obtain credit or had credit taken away from her

during the period after October 6, 2008, where even TU acknowledges her credit file was

substantially mixed with that of the other Teresa Price, by then Tesesa Webb.  In February 2009,

for example, Plaintiff's Elan Financial credit card limit was reduced based on adverse

information provided to the creditor by TU.  *See* Ex. 22, December 2007 through June 2009 Elan

Financial Adverse Action Letters.  This reduction in credit marked the fourth occasion in which

Plaintiff's credit limit was reduced based upon credit reports provided by TU to Elan.[8]  *See id.*;

*see also* Ex. 23, April 12, 2010 Deposition of Court Muchie, Elan Financial Representative, at

13:1-8; 17:13-23 (adverse actions based upon TU reports).  Plaintiff was even compelled to write

---

[8]      On December 24, 2007 Plaintiff's credit limit was reduced to $2,000.  On March 25, 2008 Plaintiff credit limit was reduced to $1,900.  On June 24, 2008, Plaintiff's credit limit was reduced to $1,800.  On June 23, 2009, Plaintiff's credit limit was reduced to $1,600.  *See* Ex. 22.

a letter to TU after receiving the February 2009 Elan adverse action letter advising TU yet again of the problem of her credit file being mixed with the other Teresa Price. *See* Ex. 24, Letter from Plaintiff to TU, dated February 28, 2009.

Plaintiff was also denied financing on March 12, 2009 in order to purchase a car for her son. *See* Ex. 25, March 2009 Wilmington Trust Adverse Action Letter. TU notably does not even challenge that it was responsible for providing Wilmington Trust with inaccurate and derogatory information about Plaintiff that was a substantial factor in causing Plaintiff to be denied credit. The inquiry history as reflected on Plaintiff's credit report indicates that the relevant dealership even tried a second lender on that same day (Wachovia Dealer Services) without success due to TU's reporting of the derogatory and inaccurate information belonging to the other Teresa Price. *See* Ex. 13 at 7-8 (January 7, 2010 report showing regular inquiries on March 12, 2009 for "Wachovia Dealer Services" and Wilmington Trust, listed as "WTC SRL").[9]

Plaintiff's emotional distress and injury to her credit reputation are also evident from her deposition testimony. Plaintiff articulates being "angry," "very upset," "stressed," "[suffering from] anxiety," "sleep loss," and "worried for [her] child" in connection with TU's actions in and around March 2009 and thereafter. *See* Ex. 26, January 6, 2010 Deposition of Teresa Price ("Price Dep."), at 49:20; 102:1-2, 102:23-24; 142:17-20; 147:11; 152:8-11. In one instance, Plaintiff candidly described her emotions: "I was livid. I was upset, I was angry, I was embarrassed." *See id.* at 147:21-22. Plaintiff's own February 2009 letter to TU further underscores the emotional toll TU's actions have had upon her. *See* Ex. 24 ("I am becoming

---

[9]     In its brief, TU confusingly contests the March 12, 2009 "WTC" denial claimed by Plaintiff although it acknowledges the "Wilmington Trust" denial of the same day. (*See* TU Mem. at 13-14). "WTC" and "Wilmington Trust" are the same car loan denial by the same entity. Wachovia Dealer Services represents another denial for the same car loan on the same day by another lending entity.

increasingly upset with the credit agencies inability to accurately document my credit."). *See also* Ex. 27, January 6, 2010 Deposition of Garry Price, at 35:22-36:2; 37:3-2 (corroborating emotional distress); *see also* Ex. 14 (listing various businesses to whom TU sold false information about Plaintiff in 2008 and 2009 -- as regular inquiries, account reviews and promotional inquiries -- thus causing further harm to Plaintiff's credit reputation).

### III.   STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c)(2), a motion for summary judgment will only be granted if:

> The pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c)(2) (revised as of Dec. 1, 2009).  The Third Circuit has said that summary judgment may only be granted if the movant shows, by admissible evidence, that there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party.  *Wetzel v. Tucker*, 139 F.3d 380, 383 n.2 (3d Cir. 1998); *Miller v. Indiana Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988), *cert. denied*, 488 U.S. 870 (1988).

A court may not, at the summary judgment stage, weigh evidence or make credibility decisions.  These tasks are left to the fact-finder.  *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993), *cert. denied*, 510 U.S. 994 (1993).  To raise a genuine issue of material fact, the respondent need not match, item-for-item each piece of evidence proffered by the movant.  As the Third Circuit has explained:

> In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quality of the movant's evidence far

> outweighs that of its opponent. It thus remains the province of the
> factfinder to ascertain the believability and weight of the evidence.

*In re Unisys Savings Plan Litigation*, 74 F.3d 420, 433 n.10 (3d Cir. 1996). If there are gaps in

the pertinent materials submitted by the movant, without explanation, that justifies denial of the

motion. *O'Donnell v. United States*, 891 F.2d 1079, 1082 (3d Cir. 1989).

In the case at bar, there exist genuine issues of material fact and Defendant is not entitled

to judgment as a matter of law. Summary judgment, therefore, is inappropriate.

## IV.    ARGUMENT

TU makes four faulty arguments in support of its summary judgment motion. It contends

that Plaintiff allegedly: (1) cannot show any evidence of an inaccuracy; (2) cannot state any

violation of FCRA section 1681i; (3) cannot show that TU caused her any damages under her

FCRA section 1681e(b) claim; and (4) cannot show any willful violation of the FCRA. These

arguments all fail, as discussed below.

**A.    TU's Contention That Plaintiff Cannot Prove An "Inaccuracy" Is Belied By
Overwhelming Record Evidence, Plaintiff's Sworn Statements, And Even The
Testimony Of TU's Rule 30(b)(6) Witness Steven Newnom.**

Astonishingly, as if they were not present during discovery, TU's counsel first argue that

TU is entitled to summary judgment allegedly due to the "absence of evidence of an inaccuracy."

*See* TU Mem. at 8. It is true that "accuracy" (and fairness) are at the heart of the FCRA. *See* 15

U.S.C. § 1681(a) (purpose of FCRA described as "accuracy and fairness in credit reporting"). It

is *not* true that there is an "absence of evidence of an inaccuracy" in this case, as TU states.

Indeed, Plaintiff sued TU because of more than two dozen chronic and serious credit

inaccuracies, stemming back almost a decade. Even after she sued, TU failed to remove

inaccuracies from her credit report. The notion that TU has an accuracy defense in this case is

totally disingenuous.

Accuracy can be a complete defense to some FCRA claims, but it is also a difficult defense. One court in this District put it this way in construing the meaning of "accuracy" within the FCRA:

> the FCRA uses the word "accuracy" more "objectively" than TU would prefer. An objective understanding of accuracy requires congruence between the legal status of a consumer's account and the status a [credit reporting agency] reports. Put another way, a consumer report cannot be "accura[te]" under either section 1681e(b) or section 1681i if it contains information that is legally incorrect.

*Crane v. Trans Union, LLC*, 282 F. Supp. 2d 311, 318 (E.D. Pa. 2003) (citing *Cushman v. Trans Union Corp.*, 115 F.3d 220 (3d Cir. 1997)) (footnote omitted). In another case against TU, the Third Circuit stated that, "prior to sending a [ § 1681e(b) ] claim to the jury, a credit reporting agency can usually prevail *only if a court finds, as a matter of law, that a credit report was 'accurate.' "* *Philbin v. Trans Union Corp.*, 101 F.3d 957, 965 (3d Cir. 1996) (quoting *Cahlin v. General Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir. 1991)) (emphasis in original).[10]

Here, there is no reasonable construction of the term "accuracy" that could possibly give TU a defense, as a matter of law, in this case. Partially citing a response to one interrogatory on

---

[10] Even if a credit item is technically accurate, a credit reporting agency still violates the FCRA if the way in which it reports that item is "misleading or materially incomplete." *Evantash v. G.E. Capital Mortg. Servs., Inc.*, 2003 WL 22844198, at *4 (E.D. Pa. Nov. 25, 2003); *Koropoulos v. Credit Bureau, Inc.*, 734 F.2d 37, 42 (D.C. Cir. 1984). A credit item may be considered inaccurate or incomplete for purposes of the FCRA if the way it is reported is misleading to potential creditors. *Agosta v. Inovision, Inc.*, 2003 WL 22999213, at *5 (E.D. Pa. Dec. 16, 2003); *Curtis v. Trans Union*, 02-C-208, 2002 WL 31748838, at * 4 (N.D. Ill. Dec. 9, 2002) (finding that even factually correct information may be "inaccurate" for FCRA purposes where such information may be misleading to a party reviewing the consumer's credit report); *see also DiPrinzio v. MBNA America Bank, N.A.*, 2005 WL 2039175, at *3-4 (E.D. Pa. Aug. 24, 2005) (materially incomplete reporting of true credit account is not accurate for FCRA purposes where creditor omitted that consumer had disputed joint account and had separated from her husband who had actually incurred the debt after separation).

the subject of accuracy, *before Plaintiff amended that and other responses based upon further discovery*, TU states that only a bankruptcy, two tax lines and eight "tradelines" (or credit accounts) are alleged to be inaccurate.  *See* TU Mem. at 2 (partially citing original September 29, 2009 response to Interrogatory No. 3, without disclosing that response was amended by Plaintiff on April 1, 2010).  Assuming those were the "only" and actual alleged inaccuracies, they would be more than enough to show a genuine issue of material fact on "evidence of an inaccuracy," which TU considers to be an "element" of both an FCRA section 1618e(b) and section 1681i claim.  In other words, TU cannot obtain summary judgment with an accuracy defense when it either acknowledges or contests 11 inaccuracies on Plaintiff's TU credit report.[11]

But the actual evidence of record shows at least *37 inaccuracies*:

### Public Records on March 11, 2009 Report
- Bankruptcy
- Kent County Tax Lien
- Kent County Release of Tax Lien

### Accounts
- Commercial Services Group - 2001
- 2 KeyBank Accounts - 2005
- CBE Group Account - 2007
- Compucredit Corp - 2007
- Bank of America Credit Card  (Charged Off) - 2008/2009
- HSBC Credit Card (Charged Off) - 2008/2009
- Capital One Credit Card – Included In Bankruptcy - 2008/2009
- Wachovia Installment Loan – Late Payment History - 2008/2009
- 2 Capital One Credit Cards - 2008/2009
- HSBC Credit Card - 2008/2009/2010
- 2 Wilmington Trust Installment Loans Bank of America - 2008/2009
- CBUSA/Sears - 2008/2009
- CreditCare/GEMB - 2008/2009
- Spirit of America National Bank - 2008/2009

---

[11]     If TU acknowledges any inaccuracies, then the element of "inaccuracy" is satisfied.  If TU contests Plaintiff's evidence of the inaccuracies (overwhelming such evidence, in this case), then there exists a genuine issue of material fact, which would preclude summary judgment under Rule 56(c)(2).

- TD Bank - 2008/2009

**Personal Information from March 11, 2009 Report**
- Teresa L. Webb
- 17 Asbury Drive, Dover DE
- Employment – Country Eaterie – Waitress
- Employment – Confident Cleaners

**Inquiries from March 11, 2009 Report**
- Professional Recovery (7/08)
- Washington Mutual Cards (7/08)
- Mid Atlantic Capital (6/08)
- Wilmington Finance (6/08)
- Leading Edge Rec (3/08)
- Atlantic Credit (2/08)
- Firstsource Advantage (1/08)
- First USA (7/07)
- Johnson Controls (6/07)
- TD Bank (5/07)
- Capital One (4/07)
- National Enterprise (4/07)

*See* Statement of Facts, Sec. D.

This evidence comes from Plaintiff's amended response to Interrogatory Nos. 2 and 3, TU's own credit file records for Plaintiff, third party discovery, and deposition testimony, including that of TU's own Rule 30(b)(6) witness Steven Newnom, who admitted that 12 credit accounts, as well as a bankruptcy and two tax liens, appearing on Plaintiff's TU credit report as late as July 13, 2009 all *did not belong* to Plaintiff.   *See* Ex. 2, Newnom Dep., at 71:3-7; 72:10-73:7; 74:2-7.

Although Mr. Newnom refused to admit that TU mixed Plaintiff's file with that of a stranger named Teresa Price (with respect to any information other than the bankruptcy), TU's other Rule 30(b)(6) witness, Lynn Romanowski, did admit that TU mixed Plaintiff's file with the other consumer named "Teresa Price" at least as of October 6, 2008.  *See* Ex. 18, January 2010 Romanowski Dep., at 40:9-41:2.  Ms. Romanowski also confirmed the obvious, that information

22

of another person mixed into a consumer-plaintiff's file is "inaccurate" by definition.  *See* Ex. 16, July 2009 Romanowski Dep., at 27:24-28:16.  Similarly, Plaintiff claims that all of the (1) personal identifiers, (2) public records of two tax liens, (3) bankruptcy, (4) 17 unknown credit accounts, and (5) 12 unknown inquiries that do not belong to her  --  and which are thought to belong to the other consumer named "Teresa Price" -- are "inaccurate."  *See* Ex. 8, at Nos. 2 & 3. There are 37 items of inaccurate information in total.

In sum, Plaintiff vehemently disagrees with and disputes what TU calls an "absence of evidence of an inaccuracy."  The detailed record here shows that there exists a genuine issue of fact on the central question of accuracy, which thus makes summary judgment inappropriate in this case.

**B.     Plaintiff Has A Valid Claim Under FCRA Section 1681i, Which TU Either Misconstrues Or Ignores.**

Next, TU erects an obvious straw man, and knocks it down.  It argues that Plaintiff cannot have an FCRA section 1681i claim (generally relating to the duties of a CRA to reinvestigate and permanently correct disputed inaccurate information) because, according to TU, the "inaccurate accounts were timely deleted, never disputed, or were accurate."  TU Mem. at 9.  TU's position may be a truism in general, but it is not Plaintiff's section 1681i claim in this case.

TU knows that FCRA section 1681i(a)(1)(A) requires it to "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate . . . ."  FCRA section 1681i(a)(5)(A) separately provides that: "If, after any reinvestigation under paragraph (1) of any "information" disputed by a consumer, an item of the information is found to be inaccurate or incomplete or cannot be verified, the consumer reporting agency shall -- (i) promptly delete that item of information from the file of the consumer, or modify that item of information, as

appropriate, based on the results of the reinvestigation."  Thus TU must reinvestigate "any" item of information and must "delete" or otherwise correct any information that is inaccurate or cannot be verified as accurate or complete.  *See* 15 U.S.C. §§ 1681i(a)(1)(A) & 1681i(a)(5)(A).

Further within FCRA section 1681i, CRAs like TU are also charged with the duty of preventing the "reinsertion" of previously deleted material back onto the consumer's credit file:

> **(B) Requirements relating to reinsertion of previously deleted material**
>
> **(i)** Certification of accuracy of information If any information is deleted from a consumer's file pursuant to subparagraph (A), the information may not be reinserted in the file by the consumer reporting agency unless the person who furnishes the information certifies that the information is complete and accurate.
>
> **(ii)** Notice to consumer If any information that has been deleted from a consumer's file pursuant to subparagraph (A) is reinserted in the file, the consumer reporting agency shall notify the consumer of the reinsertion in writing not later than 5 business days after the reinsertion or, if authorized by the consumer for that purpose, by any other means available to the agency.
>
> **(iii)** Additional information As part of, or in addition to, the notice under clause (ii), a consumer reporting agency shall provide to a consumer in writing not later than 5 business days after the date of the reinsertion—
>
> **(I)** a statement that the disputed information has been reinserted;
>
> **(II)** the business name and address of any furnisher of information contacted and the telephone number of such furnisher, if reasonably available, or of any furnisher of information that contacted the consumer reporting agency, in connection with the reinsertion of such information; and
>
> **(III)** a notice that the consumer has the right to add a statement to the consumer's file disputing the accuracy or completeness of the disputed information.

15 U.S.C. § 1681i(a)(5)(B).

Here, Plaintiff claims that TU violated FCRA sections 1681i(a)(1)(A) and 1681i(a)(5)(A) by failing to properly reinvestigate her March 12, 2009 dispute of a mixed file.  Plaintiff also claims that TU violated FCRA section 1681i(a)(5)(B) by reinserting back onto her file on July 13,  2009 the other Teresa Price's bankruptcy, which TU had deleted on March  12, 2009.  It is

true that discovery has revealed more disputes and reinvestigations by TU in 2001, 2005, and 2007.[12]   Although this history is relevant to TU's notice, to the unreasonableness of its procedures in preparing inaccurate credit reports on Plaintiff, and to the willfulness of its conduct in this case, Plaintiff has never asserted that these earlier disputes are the basis for her FCRA section 1681i claim.  The basis for Plaintiff's claims derives from her dispute on March 12, 2009 regarding the information that TU was reporting on her credit report belonging to the other Teresa Price.  *See* Statement of Facts, Sec. C, *supra*.

The record in this case clearly demonstrates that on March 12, 2009, Plaintiff disputed to TU the fact that it was again mixing information into her credit file that was not hers and belonged to another person, believed to be the other Teresa Price. TU received this dispute. Plaintiff did not limit this dispute to the bankruptcy, to the exclusion of other inaccuracies.  *See* Ex. 9.  TU, however, failed to investigate any inaccurate item other than the bankruptcy.  Only two weeks earlier, on February 28, 2009, TU had received a letter from Plaintiff clearly describing the chronic inaccuracies on her TU credit report because of the confusion between Plaintiff and the "other Teresa L. Price."  *See* Ex. 24.  On March 12, 2009, Plaintiff again "informed TU's representative that TU was continuing to report various public records, including a bankruptcy, credit accounts and personal information that did not belong to me, but belonged to another individual named Teresa Price who was of no relation to [Plaintiff]." Ex. 9.  When TU only investigated the bankruptcy -- to the exclusion of the inaccurate tax liens, accounts, inquiries and personal identifying information -- it failed to abide by FCRA section 1681i(a)(1)(A.)

---

[12]     Most of these disputes are not actionable because of the FCRA's two year statute of limitations.

TU separately violated FCRA section 1681i(a)(5)(A) when it improperly reinserted the bankruptcy back into Plaintiff's file on July 13, 2009, without verifying its accuracy or providing notice to Plaintiff.  *See* Ex. 11.  The fact that TU may have taken the bankruptcy off the file again quickly does not exclude the violation.  Instead, this conduct shows the extreme recklessness with which it treats mixed files, even after it has been sued.[13]

**C.    TU's Challenges Of Plaintiff's FCRA Section 1681e(b) Claim Fail Because Plaintiff Has Come Forward With Evidence To Show A Genuine Issue Of Material Fact On The Subjects Of Accuracy And Causation Of Damages.**

TU's next argument focuses upon Plaintiff's FCRA section 1681e(b) claim, which requires CRAs, such as TU, to prepare consumer (or credit) reports following procedures that assure "maximum possible accuracy."  *See* 15 U.S.C. § 1681e(b).  TU argues that Plaintiff cannot establish a section 1681e(b) claim allegedly because she cannot show that any action by TU "caused" Plaintiff cognizable harm.  *See* TU Mem. at 9.  TU first misconstrues what Plaintiff claims as damages in this case.  As it did with its "accuracy" defense, TU simply ignores Plaintiff's Supplemental Interrogatory Responses and Supplemental Initial Disclosures, dated April 1, 2010.  Then TU assumes that because Plaintiff had some adverse credit of her

---

[13]    Because Plaintiff did not know about the bankruptcy reinsertion (and other ongoing credit inaccuracies) until after she filed suit on March 27, 2009, she has moved to amend her Complaint to specifically plead the reinsertion claim -- and also to conform certain other claims to the evidence and to streamline this matter by withdrawing her common law claims.  Docket No. 32. That motion is still pending before this Court.  Plaintiff wishes to point out, however, that her original Complaint pleads an ongoing dispute and an FCRA section 1681i(a) claim in a manner sufficiently broad to encompass the July 13, 2009 bankruptcy reinsertion claim.  *See* Complaint, Docket No. 1, ¶¶ 16, 29(a)-(e).  Plaintiff is not aware of any rule that requires a federal court plaintiff to plead in her complaint the further subsections of the statute allegedly violated.  Thus the fact that Plaintiff did not specifically cite to FCRA subsection 1681i(a)**(5)(A)** in her Complaint is of no moment.  Nevertheless, Plaintiff respectfully requests that this Court grant Plaintiff's motion to amend, which encompasses several other changes and also makes the bankruptcy reinsertion claim crystal clear.  Under either the original Complaint or her proposed Amended Complaint, Plaintiff has a reinsertion claim under FCRA section 1681i(a)(5)(A) because TU improperly reinserted a previously deleted bankruptcy back into Plaintiff's file on July 13, 2009, and TU is not entitled to summary judgment on that claim.

own, that she cannot show that TU caused her any damages -- except for the March 12, 2009 Wilmington Trust car loan denial, which TU does not challenge in its motion.  *See* TU Mem. at 1-2.  TU is mistaken on several fronts.

First, as Plaintiff made clear from the time of her original Initial Disclosures, dated July 30, 2009, she is seeking three types *of actual damages* recognized by the FCRA:

> (2)  actual/compensatory damages in the nature of credit harm and/or economic damages;
>
> (3)  actual/compensatory damages in the nature of credit defamation; and
>
> (4)  actual/compensatory damages in the nature of emotional distress, including anxiety, frustration, embarrassment, humiliation, etc.

*See* Ex. 28, Plaintiff's Initial Disclosures dated July 30, 2009, at 3.  Plaintiff also makes it plain that in this lawsuit she is seeking the statutory damages permitted under the FCRA, punitive damages, and her attorneys' fees and costs.  *Id*.

With respect to Plaintiff's actual damages claims, TU does not even challenge Plaintiff's evidence and right to recover actual damages for credit defamation and emotional distress, as discussed below.  TU's challenge to Plaintiff's claim for credit-related losses of loss of credit opportunities fails under the Third Circuit's clear standard set forth in *Philbin v. Trans Union Corp*., also discussed below.  101 F.3d 957 (3d Cir. 1996).  Accordingly, all three of Plaintiff's actual damages claims -- credit defamation, emotional distress and lost credit opportunities -- in this case must proceed to the jury.

### 1. *TU Does Not Even Challenge Plaintiff's Evidence Or Right To Recover Actual Damages For Credit Defamation.*

A consumer litigant's right to recover for harm to one's reputation and good name under the FCRA when a credit reporting agency sells a credit report with false information about that

individual is well settled.  As the U.S. Supreme Court explained in the context of a defamation

suit brought by a business owner against a credit reporting agency:

> Petitioner's credit report concerns no public issue. It was speech
> solely in the individual interest of the [credit reporting agency] and
> its specific business audience. This particular interest warrants no
> special protection when-as in this case-the speech is wholly false
> and clearly damaging to the victim's business reputation. . . .There
> is simply no credible argument that this type of credit reporting
> requires special protection . . . .  It is solely motivated by the desire
> for profit, which, we have noted, is a force less likely to be
> deterred than others. Arguably, the reporting here was also more
> objectively verifiable than speech deserving of greater protection. .
> . . We conclude that permitting recovery of *presumed and punitive
> damages* in defamation cases absent a showing of "actual malice"
> does not violate the First Amendment when the defamatory
> statements do not involve matters of public concern. Accordingly,
> we affirm.

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761-763 (1985) (citations

omitted) (emphasis added).

Consistent with the Supreme Court's holding in *Dun & Bradstreet*, courts have regularly

affirmed that a consumer may recover for harm to her credit reputation and good name

(summarized herein as "credit defamation") as part of her claim for "actual damages" under the

FCRA.  *See Dalton v. Capital Associated Industries, Inc.*, 257 F.3d 409, 418-19 (4th Cir. 2001)

("[Plaintiff] alleges that he suffered . . . loss of reputation as a result of the false report.  Damages

for such injuries are recoverable under FCRA."); *Fischl v. General Motors Acceptance Corp.*,

708 F.2d 143, 151 (5th Cir. 1983) ("Even where no pecuniary or out-of-pocket loss has been

shown, the FCRA permits recovery for . . . . injury to one's reputation and creditworthiness.");

*Anderson v. United Finance Co.*, 666 F.2d 1274, 1277 (9th Cir. 1982) ("Actual damages may include . . . injury to credit reputation.")[14]

The numerous circuit courts' holdings cited above further verify the specific intentions of Congress in passing the FCRA:

> [T]he trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine *which can literally ruin his reputation* without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity* to obtain a mortgage to buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible *destruction of his good name* without his knowledge and without reason. . . . The loss of a credit card can, of course, be expensive, but, as Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

116 Cong. Rec. 36570 (1970) (Rep. Sullivan speaking) (emphasis added).  *See also Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (1982) (In relying on Congressional record above "We have no doubt from this record that plaintiff offered proofs from which the jury could properly have found that defendant's failure in timely fashion to use 'reasonable procedures to assure maximum possible accuracy' occasioned damage to plaintiff's name and consequent anguish and humiliation."). *See also Millstone,* 528 F.2d at 829 (upholding actual and punitive damages in case where consumer reporting agency published false, derogatory information about plaintiff even though

---

[14]     The application of tort principles to the recovery of non-economic damages is likewise inapposite under the circumstances because the FCRA is a pathway independent of the common law for a consumer to recover for non-economic harm.  *See Millstone v. O'Hanlon Reports, Inc.*, 528 F.2d 829, 834-35 (8th Cir. 1976) ("Defendant cites the much maligned rule that there should be no recovery in tort for mere mental pain and anxiety . . . . however, the rule is inapplicable because, . . . [Plaintiff] has an independent cause of action under the Fair Credit Reporting Act quite apart from any recovery he might have sought in tort.").

insurance company's initial decision to cancel insurance was quickly reversed and no adverse action was taken).

The foregoing cases and congressional record prove beyond a doubt that Plaintiff may recover for credit defamation in connection with her claim for actual damages under the FCRA. Such recovery may be predicated merely upon a showing that false and derogatory information about Plaintiff appeared on a credit report furnished to a third party.

Here, there is no doubt that TU published false and derogatory information about Plaintiff to her creditors and potential creditors. A bankruptcy and tax liens are among the most harmful and derogatory credit items that a consumer can have on his on her report. TU does not even contest that it sold these inaccurate, derogatory credit items (and many more) to Wilmington Trust on March 12, 2009. *See* TU Mem. at 1-2 (not challenging Wilmington Trust credit denial). But overwhelming evidence shows that TU published derogatory and false information about Plaintiff to many third parties, including her potential and existing creditors.

For example, TU does not contest that it mixed Plaintiff's credit file with that of the other Teresa Price at least as of October 6, 2008. Between October 2008 and January 7, 2010 -- when TU finally removed the purportedly last inaccuracy, the derogatory HSBC account -- TU sold Plaintiff's credit report at least 13 times according to its own records:

- To 3 new potential creditors (First National Bank on 12/30/09; Wachovia Dealers on 3/12/09; and to Wilmington Trust on 3/12/09, listed as "WTC SRL");

- To 5 other creditors for "account review" purposes (Discover Financial on 12/09; BAC Home Loans Servicer on 12/09; Capital One Bank USA on 11/09; U.S. Bank on 11/09; and 21st Century Insurance on 1/09); and

- To 5 other business who sought Plaintiff's credit information from TU for "promotional purposes" (Citifinancial on 10/09 and 9/09; The Travelers Companies on 9/09; Custom Mortgage Corp. on 6/09; First Premier on 3/09; and Embrace Home Loans on 7/09).

*See* Ex. 13, at 7-9, (listing inquires by dates when TU sold Plaintiff's report to third parties). The evidence of record indisputably shows that at least one, and usually many more, inaccurate derogatory credit item(s) were on Plaintiff's TU credit file during this time. Thus, the above publications of that inaccurate file plainly set forth Plaintiff's credit defamation claim, which TU does not even contest.

Given the importance of credit (as well as of one's reputation and good name) in our society, as well as the highly derogatory and offensive credit inaccuracies that appear on the face of Plaintiff's TU reports, a jury will have a proper basis to award actual damages for TU's injury to Plaintiff's credit reputation. TU does not argue to the contrary. Accordingly, Plaintiff's credit defamation actual damages claim must go to the jury.

### 2. *TU Does Not Even Challenge Plaintiff's Evidence Or Right To Recover Actual Damages For Emotional Distress.*

Plaintiff seeks damages for the emotional distress that TU caused her because it refused to correct its mixed file for years; never treated her disputes seriously or properly; caused her credit standing to suffer; and caused her to be denied credit and to lose credit opportunities. *See* Statement of Facts, Sec. G, *supra*.

The FCRA permits a consumer-plaintiff to recover a wide array of emotional and mental distress and anguish, anxiety, humiliation, embarrassment damages. *Cushman v. Trans Union Corp.,* 115 F.3d 220, 225-27 (3d Cir. 1997) (actual damages may be emotional in nature); *Lawrence v. Trans Union, LLC*, 296 F. Supp. 2d 582, 588-89 (E.D. Pa. 2003); *Evantash v. G.E. Capital Mortgage Servs., Inc.*, 2003 WL 22844198, at *5 (E.D. Pa. Nov. 25, 2003); *Crane v.*

*Trans Union, LLC*, 282 F. Supp. 2d 311, 321 (E.D. Pa. 2003); *Sheffer v. Experian Info. Solutions, Inc.*, 2003 WL 21710573, at *3 (E.D. Pa. July 24, 2003).[15]

Due to the importance of one's credit reputation in today's electronic age, juries from around the country have recognized the significance of non-economic damages in FCRA cases and have awarded consumers significant amounts of compensation for emotional distress. *See Bach v. First Union Natl. Bank*, 2005 WL 2009272, at *7 (6th Cir. Aug. 22, 2005) ($400,000 emotional distress and lost credit opportunity jury verdict upheld); *Cortez v. Trans Union*, E.D. Pa. Civ. No. 05-5684 (Docket No. 44) ($50,000 for emotional distress with no proof of economic harm); *Boris v. Choicepoint Servs., Inc.*, 249 F. Supp. 2d 851, 861 (W.D. Ky. 2003) ($100,000 for humiliation, emotional distress and embarrassment*); Thomas v. Trans Union*, Civ. No. 00-1150 (D. Or. 2002) (jury award of $5.3 million remitted to $1 million; $300,000 in compensatory damages for emotional distress damages); *Thompson v. San Antonio Retail Merchants Assn.*, 682 F.2d 509, 513-14 (5th Cir. 1982) (actual damages recoverable for humiliation and mental distress even when no out-of-pocket expenses existed).

Plaintiff again easily meets and surpasses this standard based on her interrogatory responses and deposition testimony alone, where she articulates substantial emotional impact as result of TU's actions. *See* Statement of Facts, Sec. G, *supra*. This is the type of evidence that constitutes emotional distress in credit reporting cases. *See Sloane v. Equifax Info. Servs. LLC*, 510 F.3d 495, 505 (4th Cir. 2007) (surveying cases and finding that in more recent FCRA cases challenged on appeal "emotional distress awards suggest[] that approved awards more typically

---

[15]     *See also Philbin v. Trans Union Corp.*, 101 F.3d 957, 963 & n.3 (3d Cir. 1996); *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995); *Stevenson v. TRW Inc.*, 987 F.2d 288, 296 (5th Cir. 1993); *Millstone v. O'Hanlon Reports, Inc.*, 528 F.2d 829, 834-35 (8th Cir. 1976); *Lukens v. Dunphy Nissan, Inc.*, 2004 WL 1661220, at *5 (E.D. Pa. Jul. 26, 2004) (FCRA plaintiff may recover for having to place fraud alert on his credit report and for time in dealing with and attempting to clear up credit inaccuracies).

range between $20,000 and $75,000") (*citing Zamora v. Valley Fed. Sav. & Loan Assn. of Grand Junction*, 811 F.2d 1368, 1371 (10th Cir. 1987) (upholding jury award of $61,500); *Cortez v. Trans Union, LLC*, 2007 WL 2702945, at *2 (E.D. Pa. Sept.13, 2007) (refusing to remit jury award of $50,000); *Boris v. Choicepoint Servs., Inc.*, 249 F. Supp. 2d 851, 860-61 (W.D. Ky. 2003) (remitting jury award of $197,000 to $100,000, including $75,000 award for emotional distress); *Anderson v. Conwood Co.*, 34 F. Supp. 2d 650, 656 (W.D. Tenn. 1999) (remitting jury award of $2,000,000 to $50,000)).

Thus, Plaintiff has proffered a proper FCRA actual damages claim for emotional distress based upon evidence that TU does not even challenge in its Motion. The emotional distress claim, therefore, must also go to the jury.

### 3. TU's Challenge To Plaintiff's Lost Credit Opportunities Claim Fails For That Claim Presents A Genuine Issue Of Material Fact.

TU also challenges Plaintiff's claim that she had her credit limits reduced and was denied credit opportunities. *See* TU Mem. at 11-14. TU, however, misapprehends Plaintiff's claim in this regard.[16] For starters, TU again focuses on Plaintiff's original interrogatory responses, without acknowledging the April 1, 2010 supplemental responses. Moreover, TU wrongly believes that inferences concerning certain other credit applications should be made in its favor, when controlling law states the exact opposite.

Plaintiff's claim for "loss of credit opportunities" as part of her claim for "actual damages" is clearly cognizable under the FCRA. "[N]o case has held that a denial of credit is a prerequisite to recovery under the FCRA." *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995). The Ninth Circuit in *Guimond* continued:

---

[16] For example, TU appears to challenge Plaintiff's claim of a lost credit opportunity with "WTC" but not with "Wilmington Trust." WTC and Wilmington Trust, however, are the same entity, and represent the same March 12, 2009 car loan denial.

> [W]e find that a failure to comply with § 1681e(b) is actionable
> even absent a denial of credit. Accordingly, the district court erred
> in finding that any liability under § 1681e(b) was predicated, as a
> matter of law, on the occurrence of some event-denial of credit or
> transmission of the report to third parties-resulting from the
> compilation and retention of erroneous information.

*Id.* (citations omitted) (same actual damages can be recovered under FCRA section 1681e(b) or section 1681i). *See also Cairns v. GMAC Mortg. Corp.*, 2007 WL 735564, at *7 (D. Ariz. Mar. 5, 2007) (recognizing that "damages may flow from a consumer being deterred from exercising his or her right to apply for credit as a result of inaccurate reporting until the erroneous information is deleted").

Coined as "lost credit opportunities," other courts have reached the same conclusion as the *Guimond* court. *See Lawrence v. Trans Union LLC*, 296 F. Supp. 2d 582, 588 (E.D. Pa. 2003) (J. Brody) ("The loss of credit opportunities constitutes compensable harm under the FCRA.") (*quoting Philbin v. Trans Union, LLC*, 101 F.3d 957 (3d Cir. 1996)); *Bach v. First Union Nat. Bank*, 149 Fed. Appx. 354, 362 (6th Cir. 2005) (finding that plaintiff's testimony of "lost credit opportunities in the form of a second denied mortgage application and a denied credit card application as well as injury in the form of pain, suffering and humiliation due to [Defendant's] violation," sufficient to uphold jury's actual damages award); *Rothery v. Trans Union, LLC*, 2006 WL 1720498, at *10 (D. Or. Apr. 6, 2006) ("a denial of credit is not mandatory in order to award emotional distress, humiliation and loss of opportunity damages . . . [plaintiff] has presented evidence of emotional distress, humiliation, damage to reputation and loss of opportunities as a result of the reporting of false information, her efforts to dispute the false information, and the aftermath of her failed effort").

The Third Circuit has explained that in an FCRA case a plaintiff need not come forward with a mountain of evidence in order to proceed to the jury with his or her credit damages claim.

34

In *Philbin*, the Third Circuit found the following interrogatory response to be sufficient for the plaintiff to survive summary judgment:

> Plaintiff cannot with specificity outline the actual damages sustained. However, he sustained damages over the past (4) four to (5) five years as a result of the persistent and continual rejections from credit agencies as a result of the false information contained in his credit report. Plus the humiliation and embarrassment following the rejection with the particular vendor whom [sic] he sought credit.

*Philbin*, 101 F.3d at 963 n.3; *see also Crane v. Trans Union, LLC* 282 F. Supp. 2d at 319 (summary judgment denied on similar evidence).

The standard to prove credit damages or lost credit opportunities is not high for consumer-plaintiffs. A seminal case on credit harm causation comes from our Circuit, *Philbin v. Trans Union*, which held that it is a jury issue whether a credit reporting inaccuracy was a "substantial factor" in a lost credit opportunity and that a consumer-plaintiff is minimally required to present some evidence of a credit inaccuracy and then some evidence of applying for and not obtaining credit. *See* 101 F.3d 957, 966-70.[17] In *Philbin*, the consumer sometimes offered "no reason for the denial of credit." *Id.* at 968 (as to Household). Nevertheless, the Third Circuit found that it was for the trier of fact to decide whether the denial was *caused* by TU's inaccurate credit reports by necessary implication, not a legal determination that could be made at summary judgment. *Id.* The consumer in *Philbin* was even allowed to present evidence

---

[17]    The consumer in *Philbin* presented evidence of credit denials with the aid of "adverse action" letters that financial institutions had mailed to him after declining his credit applications. Companies are required by law to provide, and sometimes in fact provide, to consumers such adverse action letters pursuant to the FCRA (15 U.S.C. § 1681m) and the Equal Credit Opportunity Act (15 U.S.C. § 1691(d)). *See Koropulos v. Credit Bureau, Inc.*, 734 F.2d 37, 46 n.15 (D.C. Cir. 1995) (in context of discussing admissibility of FCRA adverse action letter citing *U.S. v. Veytia-Bravo*, 630 F.2d 1187, 1188 (5th Cir. 1979) that "records required by law are admissible as routine business records under Fed. R. Evid. 803(6), *cert denied*, 444 U.S. 1024, 100 S. Ct. 686, 62 L. Ed. 2d 658 (1980)").

that he was turned down for credit for reasons other than the inaccurate tax lien on his credit report -- such as "insufficient credit file," "sufficient pay history not established," "limited credit experience" and "high utilization on bankcard credit lines" (as set forth in adverse action letters that he received from lenders) -- because, as the Third Circuit found, "a trier of fact could reasonably *infer* that the inaccurate adverse information included on the inaccurate credit report was an *additional, unstated reason for the credit denials*." *Id.* at 969 (emphasis added).

Other Circuit Courts have also held that credit harm stemming from inaccurate credit reporting may be established without anything close to pinpoint causal precision. In *Bach v. First Union National Bank*, for example, the Sixth Circuit upheld $400,000 in actual damages for a consumer based upon the consumer's own testimony and documents that she was denied a mortgage loan and a credit card due to inaccurate credit reporting of a fraudulently-opened credit card account. *See* 2005 WL 2009272, at *6 (6th Cir. Aug. 22, 2005).[18] The defendant in *Bach* argued that the consumer's own testimony that she was denied a second mortgage application was insufficient especially in light of evidence that the consumer had "low income," that the mortgage application was only subject to a "condition" that she owned her own condominium as collateral, and that the consumer was not simply denied outright, but only denied the loan "on the terms she sought." *Id.* The Sixth Circuit rejected all of these arguments and held that the consumer had come forward with sufficient evidence of a mortgage loan denial to support her damages. *Id.* With respect to the credit card denial, the defendant argued that the inaccurate credit information had already been "deleted" when the consumer was denied the credit card, and the consumer simply produced an adverse action letter stating that she was denied a credit card

---

[18]     The *Bach* court held that under the FCRA "in order to recover actual damages, a plaintiff must show that the violation of the statute caused the loss of credit or some other harm" and that there should be some evidence of a "causal link" between the two. *Id.*

from Bank One "due to 'credit accounts now delinquent[,] number of accounts ever delinquent[, and] total available revolving credit.' "  *Id.*  Again, the Sixth Circuit held that, viewed in the light most favorable to the plaintiff, the general reasons stated in the Bank One adverse action letter were "sufficient evidence" to show a "causal link" to the actual damages verdict.  *Id.*

Here, there is ample evidence upon which the jury could find actual damages of loss of credit opportunities.  *See* Statement of Facts, Sec. G.  Plaintiff was harmed by TU's reporting of inaccurate and derogatory credit information about Plaintiff to Elan Financial in February 2009 and on multiple other occasions, which resulted in her credit limit being lowered.  *See* Ex. 22 (adverse credit decisions based upon TU credit reports).  Plaintiff further was denied financing on March 12, 2009 in order to purchase a car for her son from *both* Wilmington Trust (or "WTC") and Wachovia Dealer Services.  These transactions alone are evidence of lost credit opportunities on which a jury may base an actual damages award according to the Third Circuit in *Philbin*.  The notion that Plaintiff may not seek damages for further lost credit opportunities with Credit Plus and Wachovia in 2008 because TU's subpoenas to those entities went unanswered (TU Mem. at 12) is flatly contradicted by *Philbin*, which allows a jury to "infer" whether TU's inaccurate credit information was a substantial factor in those denials.  The inference cannot be made in favor of the CRA.  Here, Plaintiff has presented evidence of a chronic mixed file and of lost credit opportunities after TU undoubtedly sold credit reports to Plaintiff's potential creditors.   Some of the credit denials (such as Elan Financial and Wilmington Trust) are documented and others are not.  Even for the transactions where Plaintiff can only offer her testimony and TU's records, a reasonable jury can infer that TU's mixed file was a substantial factor in Plaintiff's inability to secure credit.  Thus, TU's motion for summary judgment must be denied with respect to the lost credit opportunities claim as well.

**D.     Plaintiff Has Proffered Clear-Cut Evidence That TU's Violations Of The FCRA Were *Willful*.**

TU argues that a jury here will allegedly have no basis to find that TU's FCRA violations were willful.  A willful violation would expose TU to a punitive damages verdict under the FCRA.  *See* TU Mem. at 20-24.  TU argues that no willful violation is possible here allegedly because its conduct was not "objectively unreasonable" under the U.S. Supreme Court's decision in *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47 (2007).  *See* TU Mem. at 20-24.  This argument fails.

### 1.     The FCRA Willfulness Legal Standards

The FCRA does not define the term "willfully" and does not give any guidance as to how a defendant "willfully fails to comply with any requirement" of the Act.  *See* 15 U.S.C. §§ 1681a & 1681n.  In its only decision on the subject, the U.S. Supreme Court held that Congress intended the term "willfully" within the FCRA to have its "common law usage."  *See Safeco*, 551 U.S. at 57.  The High Court said that the common law "treated actions in 'reckless disregard' of the law as 'willful' violations."  *Id.*  It thus concluded that "[t]he standard civil usage thus counsels reading the phrase 'willfully fails to comply' in § 1681n(a) as reaching reckless FCRA violations."  *Id.* (emphasis added).

The U.S. Supreme Court in *Safeco* did not state that a reckless violation is the only one that can be willful under the FCRA: "If, on the other hand, 'willfully' covers both knowing and reckless disregard of the law, knowing violations are sensibly understood as a more serious subcategory of willful ones."  *Id.* at 59 (*citing U.S. v. Menasche*, 348 U.S. 528, 538-539, (1955) (" '[G]ive effect, if possible, to every clause and word of a statute' ") (*quoting Montclair v. Ramsdell*, 107 U.S. 147, 152, (1883)).

38

Our Circuit Court in *Cushman v. Trans Union* had, ten years earlier, correctly held that willful FCRA violations can be "knowing" or ones that show a "reckless disregard" for consumer rights.  115 F.3d 220, 227 (3d Cir. 1997).  The *Cushman* court also observed that a defendant may willfully violate the FCRA by actions that are "on the same order as willful concealments or misrepresentations." *Id.*

Perhaps Congress intended "willfully" to mean other things as well, but as clarified by precedent, willful FCRA violations can be: (1) knowing; (2) reckless; *or* (3) on the same order as willful concealments or misrepresentations.

### 2. *FCRA Recklessness Further Defined*

With respect to the lowest of these standards, "recklessness," the U.S. Supreme Court in *Safeco* observed that "[a]lthough efforts have been made to distinguish" the terms "willful," "wanton," and "reckless," "such distinctions have consistently been ignored, and the three terms have been treated as meaning the same thing, or at least as coming out at the same legal exit." *Id.* at 57 (*citing* W. KEETON, D. DOBBS, R. KEETON, & D. OWEN, PROSSER AND KEETON ON LAW OF TORTS § 34, p. 212 (5th ed. 1984)) (hereinafter PROSSER AND KEETON).  The High Court further noted that "While 'the term recklessness is not self-defining,' the common law has generally understood it in the sphere of civil liability as conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known *or so obvious that it should be known.*' " *Id.* at 68 (emphasis added) (*quoting Farmer v. Brennan*, 511 U.S. 825, 836 (1994); *see also* PROSSER AND KEETON § 34, at 213-214.[19]

---

[19]     The *Safeco* Court also cited to the RESTATEMENT (SECOND) OF TORTS, which defined recklessness with respect to a person's physical safety as follows:

> The actor's conduct is in reckless disregard of the safety of another
> if he does an act or intentionally fails to do an act which it is his

Although the Court in *Safeco* describes recklessness as an "objective" standard, that finding is entirely consistent with previous U.S. Supreme Court pronouncements in similar contexts which have emphasized that "recklessness" determinations are fact-bound inquiries that must typically be answered by a jury. *See, e.g.*, *Masson v. New Yorker Magazine, Inc*., 501 U.S. 496, 521 (U.S. 1991) (In defamation cases, "the evidence creates a jury question whether [defendant] published the statements with knowledge or reckless disregard."); *Time, Inc. v. Hill*, 385 U.S. 374, 394 (1967) ("Where either result finds reasonable support in the record it is for the jury, not for this Court, to determine whether there was knowing or reckless falsehood."); *Equitable Life Ins. Co. of Iowa v. Halsey, Stuart & Co*., 312 U.S. 410, 420-21 (1941) (In fraud case, "[t]he question of respondent's recklessness was thus submitted to the jury and we think properly so.").[20]

### 3. Many Courts Have Held In FCRA Cases That The Jury Should Decide Whether A Defendant Acted With Reckless Disregard.

In applying the reckless disregard standard to the facts of FCRA cases, many courts have found that, even though recklessness is an objective *legal* standard, the question of whether a

---

> duty to the other to do, *knowing or having reason to know* of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

*Id*. at 69 (emphasis added) (*quoting* RESTATEMENT (SECOND) OF TORTS § 500, p. 587 (1963-1964)).

[20]     The Third Circuit agrees that recklessness determinations are usually reserved for the jury. *See Frett v. Government of Virgin Islands*, 839 F.2d 968, 978 (3d Cir. 1988) (In Section 1983 case, "we have no difficulty in upholding the district court's conclusion that recklessness was a jury question."); *Healey v. Catalyst Recovery of Pennsylvania, Inc.*, 616 F.2d 641, 650 (3d Cir. 1980) (In securities action, "there was a jury question as to whether these four defendants acted recklessly"); *Hoffman v. Sterling Drug, Inc.*, 485 F.2d 132, 146 (3d Cir. 1973) (In product liability case, "whether [defendant's conduct] would constitute a reckless indifference to the public's safety, are, we think, questions which the jury should have been allowed to pass upon.").

particular set of actions or omissions shows a "reckless disregard" of consumer rights is usually a fact-bound inquiry and thus presents a question for the jury.

The Third Circuit, for example, reversed and remanded a trial court judgment as a matter of law, pursuant to Fed. R. Civ. P. 50(a), and instructed the trial court to consider the plaintiff's FCRA willfulness claim in light of the reckless disregard standard.  *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 223, 227 (3d Cir. 1997) (case settled after remand) (*citing Millstore v. O'Haleron Reports, Inc.*, 528 F.2d 829, 834 (8th Cir. 1976) (upholding FCRA willfulness finding by jury and punitive damages verdict)).

Following *Cushman*, several judges in the Eastern District of Pennsylvania have rejected motions for summary judgment by CRAs in FCRA willfulness cases, finding that the reckless disregard determination should be left for the jury.  *See Abusaab v. Equifax Info. Servs., LLC*, 2006 WL 1214782, at *2 (E.D. Pa. May 4, 2006) (Bartle, C.J.) (denying summary judgment to CRA for FCRA willfulness claim); *Lawrence v. Trans Union, LLC*, 296 F. Supp. 2d 582, 590 (E.D. Pa. 2003) (Brody, J.) (same); *Crane v. Trans Union, LLC*, 282 F. Supp. 2d 311, 321 (E.D. Pa. 2003) (Dalzell, J.) (same); *Evantash v. G.E. Capital Mortgage Servs., Inc.*, 2003 WL 22844198, at *8 (E.D. Pa. Nov. 25, 2003) (Davis, J.) (same); *Sheffer v. Experian Info. Solutions, Inc.*, 2003 WL 21710573, at *3 (E.D. Pa. July 24, 2003) (Schiller, J.) (same).[21]

---

[21]     Cases from other federal courts have also held that consumers may proceed to trial with their FCRA willfulness claims based upon conduct similar to what courts within the Third Circuit have found could constitute a willful violation of the law.  *See*, *e.g.*, *Reynolds v. Hartford Fin. Servs. Group*, 435 F.3d 1081, 1097-99 (9th Cir. 2006) (discussing meaning of "willfully" with CRA and relying on *Cushman*) (reversed by *Safeco* on other grounds, but affirmed by *Safeco* as to willfulness standard); *Apodaca v. Discover Fin. Servs. et al.*, 417 F. Supp. 2d 1220, 1229-34 (D.N.M. 2006) (denying CRA's motion for partial summary judgment and permitting consumer to proceed to trial with her willfulness claim stemming from improper procedures); *Sampson v. Equifax Info. Servs. LLC*, Civ. No. 04-187 (S.D. Ga. Aug. 29, 2005) (denying CRA's motion for summary judgment and permitting consumer to proceed to trial with willfulness claim).

These cases also demonstrate that the reckless disregard standard is usually a fact-bound inquiry, a concept that our Circuit just recently reiterated. *See Whitfield v. Radian Guaranty, Inc.*, 501 F.3d 262, 271 (3d Cir. 2007). Indeed, in *Whitfield* the Third Circuit, in a post-*Safeco* FCRA decision, reversed a grant for summary judgment on an FCRA willfulness claim and held that the issue of willfulness was for the jury to decide. *Id*. The Third Circuit stated:

> We do not suggest that a factfinder could not or would not determine that [the defendant] did not act willfully. Instead, *we hold that whether it did so is a factual issue, not a question of law, and it therefore cannot be decided either on appeal or by the District Court as a matter of law.*

*Id*. at 271) (emphasis added) (vacated on mootness grounds, 2008 WL 2329934 (U.S. 2008)).

Here, like in most FCRA cases, the issue of willfulness is for the jury. *See Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333-36 (9th Cir. 1995); *see also Rothery v. Trans Union, LLC*, 2006 WL 1720498, at *10 (D. Or. Apr. 6, 2006) (except for two accounts TU summary judgment denied as to both willful and negligent FCRA section 1681e(b) and 1681i claims); *Campbell v. Experian Info. Solutions, Inc.*, 2009 WL 3834125, at *9 (W.D. Mo. Nov. 13, 2009) (denying CRA's motion for summary judgment on FCRA willfulness claim and holding that "[b]y relying on its automated system that did not have the capability of sending an alert when such obvious evidence of a mixed file [inaccuracy] was present, [CRA] could be found by a reasonable juror to have been reckless."). *See also Crane*, *Lawrence*, *Evantash*, *Sheffer*, *supra* (denying summary judgment to TU on FCRA willfulness claims).

Plaintiff has proffered a detailed record of more than three dozen inaccuracies stemming from a TU mixed file over the course of many years. She has further established that she has put TU on notice since 2001 that another consumer's information has been appearing on her credit report. At least one of TU's corporate representatives, Ms. Romanowski, admitted that this was

a case of a mixed file as of at least 2008.  Another TU corporate representative, Mr. Newnom, admitted that Plaintiff had a dozen inaccurate accounts and an inaccurate bankruptcy on her credit file in 2009.  The record also shows that TU is the cause of mixed files, which are created on TU's CRONUS computer system, usually during the sale of a report -- *i.e.*, the "inquiry" process.

TU's failure to assure maximum possible accuracy of the information on Plaintiff's report continued for years despite the fact that: (1) TU has known about mixed files for decades and has represented that it will "avoid" and "eliminate" mixed files between two separate consumers; (2) Plaintiff put TU on notice in 2001, 2005, 2007 and 2009 that another consumer's information was being mixed into her file; and (3) TU has a procedure designed to avoid mixed files -- the do not merge tag -- which it repeatedly failed to implement in this case.

Indeed, the *do not merge* is the procedure that TU should have *followed* to assure accuracy here.  *See* 15 U.S.C. § 1681e(b) (a consumer reporting agency "shall  *follow* reasonable procedures to assure maximum possible accuracy") (emphasis added).  TU failed to follow that procedure, even after Plaintiff's repeated disputes, and even after Plaintiff sued.  *See* Statement of Facts, Secs. E & F.  Indeed, the mixed file inaccuracies remained for 9 months even after TU had notice of Plaintiff's lawsuit.  TU even reinserted a false bankruptcy back onto Plaintiff's credit file and continued to report a highly derogatory HSBC charged-off credit card account through 2010, well after it received subpoenaed documents from HSBC conclusively showing that the account was the responsibility of the other Teresa Price.  If a reasonable jury cannot find recklessness given the facts of this case and TU's general knowledge of the mixed file problem, it is difficult to imagine the circumstances in which a willfulness finding in an FCRA mixed file case would be appropriate.

**4.      Safeco's "Reasonable Reading" Language Regarding The Term "Increase" Under FCRA Section 1681m Is Not Helpful To TU.**

Defendant argues that the same defense that prevailed for the insurance company defendant in *Safeco* allows it to obtain judgment in its favor as to Plaintiff's willfulness claims in this case. *See* TU Mem. at 20-24. This argument fails.

It is true that *Safeco* used the phrase "reasonable reading" in finding for the defendant on a willfulness claim under FCRA section 1681m, the FCRA provision at issue in that case. But that part of the *Safeco* decision is not helpful to TU here.

In *Safeco*, the Court construed not only the meaning of the word "willfully" under FCRA section 1681n (as discussed above), but also the meaning of the word "increase" under FCRA section 1681m. Safeco had argued that it believed that it was not required to send an "adverse action" notice to first-time customers who were not offered the best insurance rates due to their credit reports. Safeco contended that FCRA section 1681m requires such notices for insurance companies only when there is an "increase" in "any charge or insurance," and consumers who do not *already* have insurance with the company cannot suffer an "increase." *Safeco*, 551 U.S. at 60-61. The Court disagreed: "We therefore hold that the 'increase' required for 'adverse action,' . . . speaks to a disadvantageous rate *even with no prior dealing*; the term reaches initial rates for *new applicants*." *Id*. at 63 (emphasis added).

But because the statutory meaning of the term "increase" under FCRA section 1681m was unclear on its face, and also because there was no FTC guidance or appellate court decision on that issue prior to the *Safeco* case, the U.S. Supreme Court concluded that: "a company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely

careless." *Id.* at 69.  The Court thus found that Safeco could not be in willful noncompliance with FCRA section 1681m, relating to adverse action notices for insurance companies, under those circumstances.  *Id.*

This part of the *Safeco* decision provides no defense for TU here.  It goes without saying that the Defendant in this case is not an insurance company; this case involves no "adverse action" notices or claims; and no "increase" of insurance rates is at issue.

Importantly, this is also not a case where there is any "threshold inquiry" about the "reading" of any FCRA section or provision.  Plaintiff specifically sought in discovery whether TU had any such "reading" here.  TU objected on the basis of the attorney-client privilege, and failed to produce any witness or document that could support a reasonable reading defense.  *See* Ex. 29, TU's Responses to Plaintiff's Document Requests, at Nos. 90-93, 95-101, 105; Ex. 30, TU's Objections and Responses to Plaintiff's Notice of Deposition, at Nos. 3, 4, 8.  TU cannot fairly object to discovery on the basis of privilege and then try to make a "reasonable reading" defense.[22]

---

[22]     TU appears to take the position in this litigation that only its attorneys know Defendant's "reasonable reading" of the FCRA which allegedly condones its practice with respect to mixed files.  Surely, no witness had evidence of any reasonable reading of the FCRA.  But despite that defense, TU refused to provide any information on such a "reading" on the basis of the attorney-client privilege.  That is improper and should preclude TU from making any *Safeco* "reading" argument.

Recently, in *Claffey v. River Oaks Hyundai, Inc.*, a federal court clearly stated in an FCRA case where the defendant sought to make a *Safeco* "objective reading" defense: "Allowing [defendant] to introduce such evidence and still maintain its attorney-client privilege would enable it to use the privilege as both a shield and a sword, which is not permitted."  494 F. Supp. 2d 976, 977 (N.D. Ill. 2007).  Thus the court advised the defendant that it "cannot have it both ways, [it] cannot seek refuge in consultation with counsel as evidence of [its] good faith yet prevent [plaintiff] from discovering the contents of the communication." *Id.* at 978.  *See also Dorr-Oliver v. Fluid-Quip, Inc.*, 834 F. Supp. 1008, 1012 (N.D. Ill. 1993).

Nor could Defendant now manufacture such a "reading." TU has never identified any language within FCRA section 1681i or 1681e(b) that it finds unclear or ambiguous. Unlike the meaning of the word "increase" under FCRA section 1681m at issue in *Safeco*, there is nothing "less than pellucid" about the legal standards at issue here. Multiple Courts of Appeals, including ours, have construed FCRA sections 1681i and 1681e(b) repeatedly, including in cases against this very Defendant. The Third Circuit's *Cushman* decision could not have been more precise in explaining a CRA's duty under FCRA section 1681i. The Third Circuit in *Philbin* also gave TU an explanation of the meaning of FCRA section 1681e(b). As cited above, several other circuit courts as well as district courts within our circuit have also given TU ample guidance as to its duty to prepare credit reports by following procedures that assure maximum possible accuracy, which it has failed to heed.

Thus this is not the case of a defendant searching for court or administrative guidance as to the meaning of a particular statutory duty. This is a case of deliberate and reckless noncompliance. The record here provides more than sufficient evidence on which a jury could reasonably make a willfulness or reckless disregard finding. Accordingly, TU's Motion should be denied.

---

Similarly in this case, TU cannot have it both ways. If it had a "reasonable reading" of the FCRA provisions at issue here based upon the advice of its counsel, it should have permitted Plaintiff to take discovery on such a reading. Having refused such discovery on the basis of the attorney-client privilege, TU cannot now use the purported "reading" as a sword. TU should be precluded from making any "reasonable reading" argument in opposition to Plaintiff's FCRA willfulness claims, either at summary judgment or at trial.

**5.      *TU's Matching Procedures Also Provide No Defense To Plaintiff's FCRA Willfulness Claim Here.***

TU spends some time briefing what it considers to be its reasonable "matching procedures" (how it matches a consumer's credit file to a request or inquiry from a potential creditor for that consumer's report), and then argues that its "belief" that its matching procedures were "FCRA compliant" was not "objectively unreasonable," citing *Safeco*. (TU Mem. at 14, 20). This "belief" also provides no defense to Plaintiff's FCRA willfulness claim.

First, as discussed above, Plaintiff's willfulness claim is predicated upon TU's repeated failure to follow the "do not combine" procedure and its unwillingness to permanently correct Plaintiff's mixed file despite her disputes that another person's information appeared on her credit report in 2001, 2005, 2007 and 2009, and even despite the fact that Plaintiff brought this lawsuit. Even if assuming, *arguendo*, that the "reasonableness" of TU's "matching procedures" was beyond question, Plaintiff has still set forth a proper FCRA willfulness claim.

It bears noting, however, that TU's matching procedures do not use "full indentifying information" despite its representations in the 1992 Consent Order. Because TU's criteria matches only a name and address (or a variation of the same) it is very easy for two strangers to have their files mixed on TU's CRONUS system. This loose matching is used to make credit report sales quicker and easier, not to assure accuracy. More strict matching procedures -- *i.e.*, full identifying information -- would cut down on TU's sales of credit reports, to those users who may not have or who may not care to obtain proper and full identifying information, such as debt collectors. But stricter matching would also improve accuracy. TU is simply not willing to exchange sales for accuracy, even though it represented to the AGs of 17 states that it would use "full identifying information" and would take steps to "avoid" mixed files, and generally believes that it should "eliminate" them entirely, according to its witness Eileen Little.

TU tells a long story of hypothetical consumer "Susan Jones" who allegedly benefits by having her file mixed after a marriage, and again after a divorce.  (TU Mem. at 17-18).  But TU fails to note that consumers do not change their dates of birth or social security numbers when they get married or divorced.  Indeed, the "do not combine" is TU's own procedure that requires stricter matching, including a digit-for-digit match of the consumer's social security number.  *See* Statement of Facts, Sec. F, *supra*.  This procedure would equally benefit hypothetical consumer Susan Jones, after a marriage or after a divorce.  Yet TU does not employ the do not merge procedure until after a consumer complains of a possible mixed file.  In Plaintiff's case, TU did not employ the do not merge procedure *ever* -- despite Plaintiff's disputes in 2001, 2005, 2007 and 2009 that another consumer's information was on her report.

Finally, it must be noted that TU's "belief" in its "matching criteria" is no defense to willfulness under *Safeco*.  *Safeco* discussed an objectively reasonable "reading" of "statutory text."  TU has no such "reading."  Nor can TU now manufacture an argument that, purportedly like the defendant in *Safeco*, it was genuinely confused about the meaning of an FCRA duty -- in this case the duty to assure maximum possible accuracy under FCRA section 1681e(b).  TU has had at least three Courts of Appeals' decisions construing the meaning of FCRA section 1681e(b) rendered against it in mixed file cases.  *See Philbin*, *Guimond*, *Cousin*, *supra*.  *See also* Statement of Facts, Sec. E, *supra*.  Even the FTC specifically warned consumer reporting agencies to avoid mixed files in following procedures under FCRA section 1681e(b).  *See* 16 C.F.R. pt. 600, App. (Part 3.A of commentary on § 607 of FCRA, codified at section 1681e(b)).

Further to the point, and despite TU's suggestions, there is nothing ambiguous about FCRA section 1681e(b), as Judge Buckwalter recently held:

> quite unlike *Safeco*, where the statute at issue was "less-than-pellucid" and there was a "dearth of guidance," the statutory text at

> issue here has a plain and clearly ascertainable meaning.  Section
> 1681e(b) requires that a consumer reporting agency follow
> reasonable procedures to "assure maximum possible accuracy of
> the information."

*Smith v. Hireright Solutions, Inc.,* ___ F. Supp. 2d ___, 2010 WL 1903753, at *7 (E.D. Pa. May

12, 2010) (Buckwalter) (citations omitted).  Calling its "belief" in its "matching criteria"

reasonable simply does not help TU here.  There is nothing ambiguous about the statutory

provisions at issue, there is no lack of appellate court and FTC guidance, and, unlike Safeco, TU

does not truly have any "reasonable reading" of any ambiguous FCRA section in this case, and

never had one when the violations here occurred.

## V.    CONCLUSION

For all of the reasons set forth above, TU's motion for partial summary judgment should

be denied in its entirety.

**FRANCIS & MAILMAN, P.C.**

  _/s/ John Soumilas_____
JOHN SOUMILAS
GREGORY GORSKI
Attorneys for Plaintiff
Land Title Building, 19th Floor
100 South Broad Street
Philadelphia, PA 19110
(215) 735-8600

DATE: May 26, 2010

49