**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TERESA PRICE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| TRANS UNION LLC and FINANCIAL | ) |
| RECOVERIES, | ) |
| | ) |
| Defendants. | ) |

C.A. No: 2:09-cv-01332-ER

**TRANS UNION LLC'S OPPOSITION TO PLAINTIFF'S
MOTION FOR ATTORNEY'S FEES AND COSTS**

Trans Union LLC ("Trans Union") states as follows in opposition to Plaintiff's Counsel's

("F&M") Motion for Attorney's Fees ("Fee Pet'n p._"):

For the reasons set forth herein, Trans Union respectfully submits that F&M's lodestar

should be adjusted as follows:

***Lodestar:***

| | |
|---|---|
| Mark D. Mailman, Esq.: 0.00 hours x $180.00/hr (if any) | $0.00 |
| John Soumilas, Esq.: 102.40 hours x $260.00/hr | $26,624.00 |
| Gregory Gorski, Esq.: 66.96 hours x $180.00/hr | $12.052.80 |
| Danielle Spang, paralegal: 18.80 hours x $100.00/hr | $1,880.00 |

*Total Lodestar Fees Before Negative Multiplier:*          *$40,556.80*

***Negative Multiplier: 95%:***                              ***$2,027.84***

***Costs:***                                                 ***$1,880.33***

***Total Award of Fees and Costs:***                         ***$3,908.17***

Attached hereto as *Exhibit A* is a schedule of total deductions to the fees and costs.  *Exhibit B*

hereto is a copy F&M's bills with the different categories and amounts of deductions noted.

## I.     INTRODUCTION

Among the 43 pages of F&M's bills, enormous quantities of wasted time can be identified.  The time was wasteful not only because it is an outrage to ask for $229,733.50 in fees for a $10,000 verdict.  It is also because F&M showed complete and reckless indifference toward every negative aspect of their case.  In February 2011, Trans Union served an offer of judgment for $75,000, which included fees and costs.  *Exhibit C*.  At this time, F&M knew that Plaintiff sued a debt collector that reported accurate information and that Plaintiff falsely denied responsibility for that and other accounts that were hers.  F&M knew that no FCRA violation caused Plaintiff to be denied auto loans in 2007 or 2008, or a mortgage in 2008.  But rather than accept the offer and divide this substantial sum between Plaintiff and itself, F&M rejected it.

F&M believed that, because the file was mixed at some point, it did not matter how often Plaintiff falsely disputed her own credit information.  It did not matter how terrible her credit was before the files were mixed.  F&M believed that it could convince a jury to award her substantial compensatory and punitive damages anyway.  F&M was wrong.  From Plaintiff's and F&M's standpoint, the trial was a spectacular failure.

In calculating the lodestar, the evidence shows that the reasonable rate for F&M's services is nowhere near what it seeks.  In determining the reasonable hours expended toward successful claims, it is possible to readily identify distinct, failed claims and other excessive entries that should be deducted.

All of the time F&M expended after the offer of judgment was not reasonably expended and should be deducted from the lodestar, or alternatively be eliminated by a negative multiplier.  In all respects, Trans Union submits that the degree of success obtained was as low as possible.  Not only because F&M wants 230 times more fees than the verdict, but also because the amount

of the Court's and Trans Union's time that was wasted on patently meritless claims that F&M refused to abandon.

### A.  Plaintiff's Inflated Allegations Lacked Evidence.

When Plaintiff commenced this suit, she alleged four different FCRA claims against Trans Union: 1) negligent failure to comply with §1681e(b) (the duty to "assure maximum possible accuracy"); 2) willful failure to comply with §1681e(b);[1] 3) negligent failure to comply with §1681i(a) (the duty to "reinvestigate" items of information disputed by a consumer; and 4) willful failure to comply with §1681i(a). Plaintiff also brought state common law claims of defamation and invasion of privacy.[2]

Plaintiff baselessly claimed that Trans Union had mixed her credit file with the information of another Teresa L. Price for years prior to this suit.  She wrongly denied that she had any serious delinquency in her credit history.  *See* P-6 TU-218, Plaintiff's February 28, 2009 letter to Trans Union, *Exhibit D* hereto.  She alleged not only that her report contained a January 2009 bankruptcy filed by the other Teresa Price, but also that the other Teresa Price was responsible for other negative information that was on Plaintiff's file before October 2008, including collection accounts from Financial Recoveries, National Recovery Agency and Jefferson Capital.  *See* Complaint.

In discovery, when asked directly about why she was upset at Trans Union, Plaintiff claimed that she was "floored" when she applied for an automobile loan in February 2007 and learned that her credit was "terrible."  Deposition of Plaintiff, pp.139-140.  *Exhibit E* hereto.  She

---

[1] The FCRA contains two distinct private causes of action, §1681n (civil liability for willful noncompliance) and §1681o (civil liability for negligent noncompliance).  Both §§1681n and o contain their own fee-shifting provisions allowing recovery of costs together with fees "in the case of a successful action to enforce liability."

[2] F&M's characterization of the case (Fee Pet'n p.3, "Summary of Claim") ignores entirely the negligent and willful §1681i claims and the willful §1681e(b) claim.

alleged that she was denied automobile loans in March 2008 and a mortgage in June 2008.  *See* Trans Union's October 2009 Motion for Sanctions *Exhibit C* {Dkt#18}, Plaintiff's Response to Interrogatories 3 and 6.

Plaintiff also claimed that, over a period of years, she informed Trans Union on numerous occasions that another Teresa L. Price "shares the same year of birth but not date, and the first 5 numbers of our social security numbers"; and that she "noted her last names (not [Plaintiff's]) on [Plaintiff's] credit report and [the other Teresa Price's] prior addresses." *Exhibit D* hereto.  She alleged that she called Trans Union in March 2008 and disputed not only the bankruptcy (which was deleted within 5 days of the call), but also other items that Trans Union failed to correct.

### B.    Trans Union Refuted All Disputed Factual Allegations.

In reality, Plaintiff never identified any personal identifying information that did not belong to her at any time prior to the suit.  Trans Union had records of another Teresa L. Price who had also had a last name of Webb and a Social Security number that matched 7 of 9 numbers with Plaintiff, but those records were kept separate from Plaintiff's records until October 2008.  It became clear that the combine occurred because Wilmington Trust provided Trans Union with Plaintiff's address and the other Teresa Price's Social Security number shortly after Plaintiff and her son opened an automobile loan with Wilmington Trust in February 2007.

Thus, there was no dispute that the files were mixed when the other Teresa Price filed bankruptcy in January 2009, and as a result, the bankruptcy posted to Plaintiff's file.  There was also no dispute that Plaintiff identified the bankruptcy in March 2009 and that Trans Union deleted it 5 days later.

However, Trans Union vigorously disputed Plaintiff's contentions that information on Plaintiff's file prior to the October 2008 combine belonged to anyone other than Plaintiff.  No

4

violation of the FCRA by Trans Union could have possibly caused Plaintiff to be denied loans in 2007, or March or June 2008, because Plaintiff's report was accurate throughout that time.  Trans Union had no reason to believe that Plaintiff disputed anything other than the bankruptcy in March 2009 that was deleted.  Plaintiff's deposition transcript seemed to confirm this.

### C. Trans Union's Ultimately Successful Partial Summary Judgment Motion.

Following discovery, and confident that there was no genuine dispute about the accuracy of Plaintiff's reports prior to October 2008 and the content of Plaintiff's communications to Trans Union, Trans Union moved for ***partial*** summary judgment.  Trans Union did not ask the Court to dismiss the negligent §1681e(b) claim; it was plain based on the record as it existed at that time that a jury would have to decide whether the inaccurate report of the bankruptcy caused Plaintiff to be denied the March 2009 automobile loan.  Trans Union did not ask, at summary judgment, to deny Plaintiff the opportunity to present her emotional distress claims from the jury.  Instead, Trans Union argued that there was no evidence that its §1681e(b) compliance procedures were in willful noncompliance with the FCRA.

Trans Union also argued that it could not have negligently or willfully violated §1681i because the only item Plaintiff disputed in March 2009, the bankruptcy, was deleted.  In response, F&M filed an affidavit from Plaintiff that alleged that other items were disputed on the phone in March 2009.  Trans Union objected that the affidavit was a "sham."

The Court denied Trans Union's partial summary judgment motion.  But Trans Union's position in that motion was vindicated by the jury in every respect.  Trans Union did not willfully violate §1681e(b).  Trans Union did not negligently or willfully violate §1681i.  Plaintiff did not file a "successful action to enforce liability" under §1681n because nothing Trans Union did was

in willful violation of any provision of the FCRA.  Plaintiff did not file a successful action to enforce liability of §1681i because, contrary to the "sham" affidavit, Plaintiff did not dispute any item on her file other than the bankruptcy in March 2009.

**D.     Plaintiff's Untimely Motion to Amend the Complaint.**

For a few hours on July 13, 2009, Trans Union reinserted the previously deleted bankruptcy.  F&M asked counsel for Trans Union for a copy of Plaintiff's file prior to the July 14, 2009 initial conference.  In response, Steve Newnom, Trans Union's consumer relations corporate representative who was at that time unfamiliar with the file, re-combined the files of the two Teresa Prices that were separated following the suit.  Trans Union's counsel immediately recognized the error and Mr. Newnom immediately corrected it.  A new report was provided to F&M that day.  No one outside of Trans Union and F&M received any report containing this information.  F&M brought it up at the initial conference the next day, but did not immediately move to amend the complaint.  It seemed that this tempest in a teapot had boiled over.

However, eight months after the time to file an amended complaint had expired, F&M tried to turn this non-event into a willful FCRA violation.  F&M did not believe it was impertinent; it thought Trans Union was reckless.  But F&M's own negligence cost Plaintiff the opportunity to present this claim to the jury.  The only reason why this claim could not go forward was because F&M failed to amend the Complaint in accordance with this Court's scheduling order.  Nevertheless, Plaintiff was allowed to use post-suit events for the willfulness claims, including the July 13, 2009 report and a report showing that an HSBC account was not deleted until January 2010.  The willfulness claims still failed.

E. **Plaintiff's Baseless Claims Led To Numerous Subpoenas. When the Subpoenas Confirmed the Lack of Merit to these Claims, Plaintiff Had to Move *In Limine* to Exclude Them.**

Because Plaintiff falsely claimed that Trans Union's reports contained errors before the October 2008 combine, causing her to be denied credit prior to that date, Trans Union served sixteen subpoenas on third parties to determine the accuracy of disputed information; and to determine why Plaintiff was denied credit.  F&M unjustifiably interfered with those subpoenas and was sanctioned by the Court for such interference.  It admits that some of the time spent interfering with the subpoenas was not compensable, but not all such time.

But it would not be reasonable to stop the lodestar adjustment at F&M's interference with the subpoenas; additional adjustments to F&M's time spent on the subpoenas themselves are warranted.  Interestingly, and quite clearly, almost all of the work on the subpoenas could have and would have been avoided, had Plaintiff not argued that her report was wrong prior to the October 2008 combine.  As discussed in Trans Union's October 2009 motion and attached thereto as *Exhibits A* and *B*, Trans Union served "accuracy subpoenas" and "causation subpoenas" to entities identified in Plaintiff's Responses to Interrogatories 3 and 6 as inaccurate information that caused Plaintiff harm prior to October 2008.

Once F&M's interference with the subpoenas was overcome and the discovery revealed the utter lack of merit to Plaintiff's pre-October 2008 claims, F&M found itself in the ironic position of moving *in limine* to preclude Trans Union from presenting evidence about Plaintiff's own allegations and her creditworthiness.  But the *in limine* motions were filed after months of discovery was wasted on these meritless claims.  This was entirely Plaintiff's and F&M's fault. It would be unreasonable to require that Trans Union compensate F&M for any of this.

**F.      There Were No Disputed Facts Respecting Plaintiff's Successful Case.**

Respecting the narrow issue upon which Plaintiff was successful, there was no dispute as to what personal identifying information belonged to whom.  There was no dispute that Trans Union had a "do not merge" tag that would have prevented the October 2008 combine.  Trans Union had disclosed the existence of this tag to F&M in a prior lawsuit.  Trans Union's corporate representatives testified about how the tag worked and what in what circumstances the tag should be used.  Trans Union also presented testimony and evidence about how it prepares consumer reports for 200 million consumers across the country; Plaintiff never challenged Trans Union's evidence about these procedures at any point in the suit.

There was also no dispute that no personal identifying information belonging to anyone other than Plaintiff appeared on her file prior to October 2008. Plaintiff disputed the ownership of several items of credit on 2005 and 2007, including accounts that were verified that Plaintiff ultimately admitted belonged to her.  Other accounts she disputed at that time were deleted for various reasons (but no creditor stated that it had the other Teresa Price's personal identifying information associated with any account).  Trans Union inserted the comment "does not belong to consumer" into some of its internal records following the disputes.  F&M said that these communications should have caused Trans Union to use its "do not merge" tag and Trans Union argued that it should not have tagged the file.  The jury had to consider this evidence; at no point prior to the trial did Trans Union argue otherwise.

**G.      The Result.**

On May 23, 2011, Plaintiff received $10,000 for the negligent 1681e(b) violation, 7.5 times less than the Offer.  Plaintiff lost every other claim.  She received $0 in punitive damages.

8

### H.      Plaintiff's Outrageous Settlement Demands.

Conspicuous in its absence from the Fee Petition is any statement of what Plaintiff demanded at any time throughout this suit.  Settlement conferences were held before Magistrate Judge Reuter on October 5, 2009 {Dkt#17} and before your Honor on December 18, 2009 {Dkt#23} (before the ruling on the motion for sanctions and any deposition).  Plaintiff never demanded less than $200,000 before Magistrate Judge Reuter ol your Honor.  Plaintiff rejected the Offer of Judgment in February 2011.  On May 12, 2011, Plaintiff demanded approximately $400,000.

### I.      Lack of Success Compared to Other F&M FCRA Cases

Despite the obvious failure to recover anywhere near what Plaintiff was offered, F&M brazenly requests $229,377.50 in fees.  This is almost exactly what F&M recovered from two successful cases against Trans Union *combined*.  In *Cortez v. Trans Union LLC*, 2007 U.S. Dist. LEXIS 68074 (E.D. Pa., Sept. 13, 2007) the plaintiff was awarded $50,000 in compensatory and $100,000 punitive damages, and Judge Fullam awarded F&M $125,000 in fees (which the Third Circuit expressly affirmed.  617 F.3d 688, 695 fn.1 (3d Cir. 2010)).  In *Dixon-Rollins v. Experian Info. Solutions, Inc.*, 2010 U.S. Dist. LEXIS 100013 (E.D. Pa. Sept. 23. 2010), the plaintiff was awarded $30,000 in compensatory and $270,000 in punitive damages, and Judge Savage awarded F&M $104,852.50 in fees.

Here, F&M recovered $10,000 in compensatory damages and $0 in punitive damages. Simply in terms of total dollars, F&M wants essentially the same in fees[3] that it received in

---

[3] Total verdicts in *Cortez* and *Dixon-Rollins*: $440,000.  Total fees award by both district judges: $229,852.50. (This does not include F&M's fees incurred on appeal, which was settled following the Third Circuit's opinion) Difference between last two *combined* successful fee petitions and the instant petition: $475.

*Cortez* and *Dixon-Rollins* combined, where they recovered 44 times more money for those clients than they did for Ms. Price.  If this Court were to award F&M fees in proportion to the *Cortez* verdict, F&M would receive $8,333.33; if this Court were to award F&M fees in proportion to the *Dixon-Rollins* verdict, F&M would receive $3,495.08.

F&M's Fee Petition, p.4, says that "Plaintiff was successful...at trial."  But Fee Petition *Exhibit D* (Doc. 141-2, p.95) admits by its silence that this is not so.  Mr. Soumilas' resume touts his success in *Cortez* (the "OFAC Alert" case) and *Dixon-Rollins* (the "old landlord collection claim for rent"), but is entirely silent on *Price*.  Mr. Soumilas has updated this list since *Price*; it includes the "class action settlement" (*Id.* p.94) approved by Judge Brody on June 15, 2011, after the *Price* verdict.  *Chakejian v. Equifax Info. Servs.*, 275 F.R.D. 201 (E.D. Pa. 2011).

By this measure, F&M's claim of success is hollow.  By any measure, its demand for $229,377.50 in fees is outrageous.

## II.    STANDARD OF REVIEW

The first step in determining a fee petition is to estimate the "lodestar"; in doing so, "a court makes two reasonableness determinations: the hourly rate and the number of hours expended by the attorneys."  *Becker v. Arco Chemical Co.*, 15 F.Supp.2d 621, 627  (E.D. Pa. 1998) *citing Blum v. Stenson*, 465 U.S. 886, 888, 79 L. Ed. 2d 891, 104 S. Ct. 1541 (1984); *Hensley v. Eckerhart*, 461 U.S. 424, 433, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983); and *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990).

The hourly rate should be determined by evidence as to the reasonable market rates. *Lanni v. N.J.*, 259 F.3d 146, 149 (3d Cir. 2001) (*citations omitted*):

> The party seeking fees bears the burden of producing sufficient evidence of what constitutes a reasonable market rate for the essential character and complexity of the legal services rendered in

10

order to make out a prima facie case. If the prima facie case has been made, the opposing party bears the burden of producing record evidence that will contest this rate. If reasonable market rates are in dispute, a hearing must be conducted.

Where, as here, a plaintiff was only partially successful, the number of hours should "include only the work that reasonably was expended in pursuit of the sole successful claim." *McKenna v. City of Phila.*, 582 F.3d 447, 457-458 (3d Cir. 2009). When a plaintiff in a fee-shifting case has partial success:

> The court must consider whether the results obtained by the prevailing party justify an award of attorney's fees for hours spent on related but unsuccessful claims. *Hensley* at 435. When the relief obtained is excellent, the prevailing party may recover fees for "all hours reasonably expended on the litigation." *Id.* at 436. If the prevailing party does not obtain substantial but only partial relief, a full award of fees for all hours spent on related, unsuccessful claims would be excessive. *Hensley* at 440.

*West Virginia University Hospitals v. Casey*, 898 F.2d 357, 361 (3d Cir. 1990).

"After a district court determines the lodestar, its discretion comes into play and it can adjust the fee for a variety of reasons. The most important factor in exercising this discretion is the 'results obtained' by the plaintiff." *Public Interest Research Group v. Windall*, 51 F.3d 1179, 1185 (3d. Cir 1995) *quoting Hensley,* 461 U.S. at 436. *See also Sheffer v. Experian Info Solutions, Inc.*, 290 F. Supp. 2d 538, 542 (E.D. Pa. 2003) (Schiller, J.) "'[T]he most critical factor' in the analysis of a reasonable fee is 'the degree of success obtained.'" *quoting Hensley*.

However, *Hensley* does not permit the district court to take a "short cut" in determining the lodestar by simply applying a negative multiplier. *Public Interest*, *supra*, 51 F.3d at 1189, fn.13. If hours billed for unsuccessful claims are "distinct in all respects" from hours billed to successful claims, they should be deducted from the lodestar. *Rode*, *supra*, 892 F.2d at 1183.

11

The relatedness between successful and unsuccessful "general claims" may be "too tenuous" to count toward the lodestar under the circumstances. *Washington v. Phila. Ct. of Com. Pl.*, 89 F.3d 1031, 1044 (3d. Cir 1996). Thus, the fact that all of Plaintiff's claims were FCRA claims is not enough, alone, to make them related.

In *West Virginia University Hospitals*, the Third Circuit held that the petitioning attorney's billing records are presumptively reliable: "In the absence of evidence to the contrary, we choose to believe that counsel were intellectually honest with the court and their opponents and properly allocated the hours worked and the measurement of time." 898 F.2d at 365. Regrettably, however, there is substantial evidence to question the validity of F&M's time entries. On August 13, 2010, Mr. Soumilas billed Trans Union 2.70 hours (at an exorbitant $410/hr) to "**Read Cortez v. Trans Union decision by Third Circuit**" and prepare a notice of supplemental authority. Trans Union paid Mr. Soumilas to read *Cortez*, in *Cortez*. On the same day F&M filed the notice of supplemental authority in this case {Dkt#53, *Exhibit F* hereto}, **F&M filed the same notice in Dixon-Rollins.** 2:09-cv-00646-TJS, Dkt#114 (*Exhibit G* hereto). The notice in the instant case related to emotional distress damages, which had nothing to do with Trans Union's **partial** summary judgment motion in this case; but was relevant to the post-trial motion in *Dixon-Rollins*. This evidence of unreliability is pertinent to the Court's evaluation of all of F&M's submissions.

12

## III.    LODESTAR – REASONABLE RATE DETERMINATION

Based on the undisputed evidence, the Court can determine the market rates and should determine that F&M's rates should be set at the bottom of the Community Legal Services of Philadelphia ("CLS") schedule.

F&M admits, as it must, that the CLS schedule should be used to determine the proper hourly rate.  Fee Pet'n, p.18.  However, F&M does not use that schedule and it fails to attach it to the petition.  It is attached hereto as *Exhibit H*.  Instead, F&M submits a report from Abraham C. Reich, Esq., of Fox Rothschild from March 2011.  Fee Pet'n. *Exhibit B* (Dkt#141-2 pp.51-61). The Court should not consider this report because Trans Union did not have an opportunity to examine Reich.  One essential document that Reich examined that has not been produced in this litigation is F&M's client fee agreement.  *Id.*

Mr. Reich's report also considers F&M vis-à-vis the largest firms in Philadelphia, such as "Blank Rome, Cozen O'Connor, Duane Morris, Fox Rothschild" and others.  In reality, however, F&M is a small firm that could not compete with the rates commanded by "Big Law's $1,000 Plus an Hour Club" (*id.*) or anywhere near it.

In stark contrast to the most prestigious Philadelphia law firms Reich discusses, F&M's services are found on the Internet along with "credit repair organizations." *See* Credit Repair Organizations Act, 15 U.S.C. §1679 *et seq.*, discussed in Trans Union's Motion for Judgment as a Matter of Law, pp.22-25.  A Google search of "credit report lawyer" or "credit report problem" (on April 18, 2012) revealed a sponsored (paid advertisement) link "creditreportproblems.com" that shills F&M's services.  Another sponsored link that comes up in this search is Lexington Law, a notorious "credit repair organization" that was targeted by the FTC in "Operation

Payback, A Federal-State Crackdown on Credit Repair Fraud." *See* http://www.ftc.gov/opa/1996/04/ credlst.shtm (last visited April 18, 2012).

      With all due respect, F&M's services are more in line with "credit repair organizations" than the "white shoe" firms to whom it aspires.  At least with respect to co-defendant Financial Recoveries, F&M's conduct was the same as a "credit repair organization" that falsely claimed that a debt collector reported information about another individual.  Equifax and Experian never reported a bankruptcy on Plaintiff's report, yet they were sued in New Jersey for reporting the same accurate information that Trans Union reported.

      No lawyer in a "$400 per hour club" does, would or should file volume boilerplate complaints like F&M.  A search of the Eastern District of Pennsylvania ECF Website for Mark D. Mailman (last search April 19, 2012) yields 1,056 cases filed over the last 12 years.  F&M files cases against Trans Union, Equifax, Experian, debt collectors, banks, credit card companies, and other financial institutions using the same boilerplate form.  The complaints filed in the instant case and in the District of New Jersey were such boilerplate.  F&M may claim that it researches the complaints before filing them, but the misstatements in the two cases filed on behalf of Ms. Price were obviously not researched with any rigor – otherwise Plaintiff would never have sued Financial Recoveries or denied responsibility for accurate items.

      Other relevant evidence to the reasonable rate is the order sanctioning F&M; the entirely unsubstantiated summary judgment affidavit; and the 2.7 hours billed to Trans Union to read *Cortez*, etc., when Trans Union already paid F&M its appellate fees.  *See supra*.

      Additional evidence supporting such rates is of record in Trans Union's fee petition. {Dkt#140.}  Mr. Luckman, a lawyer with over 25 years of experience, billed $200.00/hr.  Mr.

Creech, a lawyer with 14 years of experience, also billed $200.00/hr.  Patricia Reid, a certified paralegal with more than 25 years of experience, billed $95.00/hr.

Under these circumstances, for a case that was not complex and was overly complicated by F&M's own conduct, F&M should be awarded fees at the bottom of the CLS scale.  Mr. Soumilas, a lawyer with 14 years of experience, wants an hourly rate of $410.00, the rate of a lawyer with more than 25 years of experience.  Mr. Soumilas should be awarded the lowest rate on the CLS scale for a lawyer with 11-15 years of experience: $260.00/hr.  (Still $60.00/hr more than Mr. Creech billed to Trans Union, a lawyer with comparable experience to Mr. Soumilas.)

Mr. Mailman's requested rate of $487.50 is entirely off the charts.  Mr. Mailman assisted Mr. Gorski in preparing the complaint and he reviewed a summary judgment order.  As set forth below, all of his time is excessive and should be deducted from the lodestar.  Mr. Gorski, who acted as second counsel, wants the hourly rate of $325.00, the rate of a lawyer with 11-15 years of experience.  If Mr. Mailman is awarded anything, he and Mr. Gorski, who merely assisted Mr. Soumilas, should be awarded the lowest rate on the scale for lawyers with 2-5 years of experience: $180.00/hr.  (Only $20.00/hr less than actually billed by Mr. Luckman to Trans Union, a lawyer with more than 25 years of experience.)

Ms. Spang, paralegal, was billed at $145.00/hr, higher than the CLS scale for the most experienced paralegal.  Ms. Spang should be awarded $100/hr, the lowest rate for an experienced paralegal.   (And $5 more than Ms. Reid, a paralegal with more than 25 years of experience.)

**IV.     LODESTAR – DEDUCTION OF HOURS UNREASONABLY SPENT**

> **A.     F&M's Bills Relating to the Partial Summary Judgment Motion and Motion to Amend Are Readily Identifiable and Should Be Deducted As Unsuccessful.**

> > **1.     Plaintiff's Summary Judgment Opposition Was 100% Unsuccessful.**

F&M's statement that "Plaintiff was successful at summary judgment ... " is simply not true.  Fee Pet'n p.4.  A "successful action to enforce liability" under §1681n and §1681o is an action that results in a finding of liability, not an order denying a summary judgment motion.

In reality, F&M's opposition to summary judgment was a total failure.  Trans Union moved for *partial* summary judgment on the willful §1681e(b) claim and the negligent and willful §1681i claim.  Nothing in Trans Union's motion sought judgment on the negligent §1681e(b) claim or that Plaintiff suffered damages.  This position was 100% vindicated by the jury.  Trans Union did not willfully violate §1681e(b) and that it did not negligently or willfully violate §1681i.  Not one aspect of F&M's opposition to the summary judgment motion resulted in a "successful action to enforce liability" under either §1681n or §1681o.

Trans Union respectfully reminds the Court of the extraordinary amount of time and effort F&M wasted with an inaccurate affidavit in opposition to summary judgment.  When Plaintiff was deposed, it was clear that the only item she disputed to Trans Union in March 2009 was the bankruptcy, which was deleted within days of the dispute.  But when her lawyers assisted her in preparing a summary judgment affidavit, they cleverly re-couched her testimony in a manner that made it look like the deposition was incomplete or ambiguous, and that she identified errors beyond the bankruptcy in her March 2009 phone call.  Over Trans Union's

16

objection that the affidavit was a "sham," the Court allowed Plaintiff to testify as to what she disputed on the phone.

When Plaintiff took the stand, and could no longer be assisted by F&M, the ambiguity again disappeared. To the surprise of Trans Union's counsel, who was prepared to confront Plaintiff with her inconsistent testimony and affidavit about what she said on the phone, there was nothing to confront. Her direct examination identified no dispute of anything other than the bankruptcy. That is why her §1681i claim failed.

F&M also claims success on Trans Union's "motion to strike Exhibit 15 to the summary judgment briefing." Fee Pet'n p.5. This exhibit was the 1992 consent decree which, consistent with the express terms of the order, this Court did not use. The whole of F&M's time spent on partial summary judgment motion was a total loss.

>     **2.**     **As a Result of F&M's Negligence, Plaintiff's Motion to Amend the Complaint Was a 100% Failure and all Hours Should be Excluded.**

At the same time that Trans Union moved for summary judgment, and eight months after the deadline to do so, F&M sought to amend the complaint. In its fee petition, F&M seeks 100% of the time billed for "Plaintiff's motion for leave to file an amended complaint, which was granted in part and denied in part..." Fee Pet'n p.5.

This is absurd. Plaintiff moved to amend the complaint to add another FCRA claim, and she moved to dismiss, without opposition from Trans Union, her state common law claims. The Court denied her motion to amend the FCRA claim because it was untimely, but granted the unopposed request to dismiss the common law claims. {Dkt#54.} The only reason that Plaintiff could not pursue the additional FCRA claim was F&M's own neglect in waiting *eight months* past the time to amend. Accordingly, all of F&M's time should be deducted from the lodestar.

17

3.      **Adjustments to Lodestar Based On Summary Judgment and Motion to Amend Complaint**

Category "A" in *Exhibits A* and *B* total as follows:

| | |
|---|---|
| Mailman: | − 1.80 |
| Soumilas: | − 42.70 |
| Gorski: | − 45.80 |
| Spang: | − 30.50 |

B.      **F&M Should Not Be Awarded Fees For Her Interference With Trans Union's Subpoenas, or For Opposing Trans Union's Motion to Extend Discovery,**

On October 20, 2009, F&M "waged" objections to Trans Union's subpoenas, and on October 21, 2009,[4] F&M unlawfully sent letters to the subpoenaed parties stating that the objections were "waged."  F&M cut some time related to these events, but not all.  For example, Mr. Soumilas billed 1.70 hours on October 20, 2009, and Mr. Gorski billed 0.50 hours on that same date.

As a result of F&M's conduct in interfering with Trans Union's subpoenas, on January 6, 2010, Trans Union moved to extend the time to complete discovery {Dkt#25}.  Plaintiff opposed this motion on January 19, 2010 {Dkt#28} and the Court granted the motion on January 21, 2010 {Dkt#30}.  F&M was sanctioned for interfering with the subpoenas; it should not be reimbursed for any of its time related to such interference, including the motion to extend.

---

[4] *See* Mr. Luckman's time entries, attached to Trans Union's motion for attorney's fees.  Contrary to F&M's Opposition to that motion, Mr. Luckman did not prepare any subpoenas on October 20, 2009 and Trans Union did not ask this Court to reimburse bills for preparing the initial subpoenas.  Due to F&M's failure to properly identify inaccuracies and damages suffered as a result of inaccurate reports, Trans Union had to conduct an enormous amount of third-party discovery. F&M unlawfully objected to that discovery and forced Trans Union to take action against those objections.  F&M's argument in opposition to Trans Union's request for fees, that it should not have taken so long for Trans Union to overcome the barriers of F&M's own making, is simply without merit.

On January 4, 2010 Mr. Soumilas billed Trans Union 0.90 hours to: "Review select data from file; think re: strategy matter, call to client, review select issues with GG."  This entry is too vague to be compensable.  Given its proximity to the motion for sanctions, this entry should be excluded in their entirety from the lodestar calculation.  Other entries, such as Ms. Spang's calendaring of the December 1 and 16, 2009 hearing notices, relate to the sanctioned conduct.

Category "B" in *Exhibits A* and *B* total as follows:

| | |
|---|---|
| Soumilas: | − 6.90 |
| Gorski: | − 3.80 |
| Spang: | − 3.10 |

### C.    F&M's Time Spent On the New Jersey Suit and On Abandoned Pre-October 2008 FCRA Claims Were Distinct and Should be Deducted from the Lodestar.

F&M argued, when it was in its own and its client's interest, that "Plaintiff's lawsuits against other parties were completely irrelevant to this case." Pltf's New Trial Memo of Law, p.13 {Dkt.#121}. She wanted Trans Union to say nothing about her other claims or suits because she believed herself to be "master of her case and may try whatever claims, and pursue whatever cognizable damages, she thinks gives her the best chance of winning at trial -- regardless of whether she brought additional or alternative claims that she is now not pursuing."  Pltf's In Limine Memo, p.4 {Dkt#67-2}.  F&M made the same arguments respecting the automobile loan denials in February 2007 and March 2008 and the mortgage denial in June 2008.  *See* Dkt#67-2, pp.13-14; Dkt#121, pp.11-14.   Likewise, F&M did not want Trans Union to introduce any evidence about her accurate, terrible credit history prior to the October 2008 combine.  Dkt#67-2, pp.9-10.

Now, however, F&M wants Trans Union to pay for all of the time F&M wasted in dealing with the meritless claims.  It was F&M's own doing that caused it to spend enormous swaths of time on Plaintiff's baseless claims of inaccuracies and denials of credit. F&M argued repeatedly that these matters were irrelevant.  It should be estopped from claiming that any of this time is not distinct and should be included in the lodestar.

        **1.**        **Substantial Portions of F&M's Time Spent on the Original Complaint Should Be Deducted From the Lodestar.**

F&M admits that 50% of its time in researching and drafting the Complaint is attributable to the co-defendant Financial Recoveries.   However, the Complaint against Trans Union respecting Financial Recoveries and other items was, as Plaintiff later admitted, inaccurate. Plaintiff's Complaint denied responsibility of other items, National Recovery Agency and Jefferson Capital, that she would later admit actually belonged to her.  The same claims were filed in New Jersey against Equifax and Experian.  Accordingly, F&M's time dedicated to Trans Union accounted for only 20% of the time entries.

F&M entirely failed to research the accuracy of Plaintiff's claims.  At trial, Plaintiff admitted that she did nothing to verify the accuracy of her claim that the Financial Recoveries item did not belong to her.  Trans Union respectfully submits that F&M's time to research, draft and file the complaint should be deducted from the lodestar calculation.

Category "C.1" in *Exhibits A* and *B* total as follows:

      Mailman:       − 1.40
      Gorski:        − 5.84

2.      **F&M Wasted An Extraordinary Amount of Distinct Time By Forcing Trans Union to Serve 15 Unnecessary Subpoenas.**

As noted above, and discussed in Trans Union's October 2009 motion for sanctions, Trans Union served "accuracy subpoenas" to Bank of America, Capital One, HSBC Bank, Jefferson Capital Systems, National Recovery Agency and Wachovia to determine whether the information Plaintiff claimed did not belong to her was accurate.  After Trans Union received these subpoena responses, the only account that actually belonged to the other Teresa Price was HSBC Bank.

Respecting the HSBC Bank item, after F&M "waged an objection" to the documents Trans Union subpoenaed, Plaintiff listed HSBC Bank on her witness list, and Plaintiff identified the documents produced in response to the subpoena as Trial Exhibit P-10.  Plaintiff tried to introduce P-10 through Trans Union's witness, Steve Newnom, and Trans Union objected.  May 19, 2011 trial testimony, p.50.  The Court sustained Trans Union's objection, and admonished Plaintiff's counsel (*id.* p.51):

```
                      Mr. Newnom - Direct              51
     6            MR. SOUMILAS:  But, Your Honor, could I move
             them into evidence as a business record?
     7
     8            THE COURT:  Bring in a witness who will do
     9       that.  By the way, you guys are wasting an awful lot of
    10       time.  These people are all falling asleep here, so
    11       we've got to get to the point here.
```

The reason why Plaintiff questioned Mr. Newnom about the HSBC item, and tried to show him P-10, is because Trans Union did not delete the account until January 2010, after the subpoena response was received.  Plaintiff was allowed to use post-suit events as evidence of willfulness, but not negligence or damages.  The willfulness claim failed.

Moreover, on March 16, 2011, over Trans Union's objection, and **after** Plaintiff identified the HSBC documents and witness, F&M received another opportunity to depose third party witnesses.  *See* DKT#87.  Due to an illness and death in defendant's counsel's family, this opportunity extended over two months.  F&M took the opportunity to take depositions of witnesses who were never called at trial, but failed to secure testimony from HSBC to use the documents obtained from Trans Union's subpoena.[5]

Plaintiff's false claims that she was denied credit prior to October 2008 also caused Trans Union and F&M to waste an extraordinary amount of time.  As noted above, in her response to Interrogatory 6, Plaintiff claimed that she suffered many denials of credit as a result of inaccurate Trans Union consumer reports.  Plaintiff identified "Wachovia Dealer Services," "CitiFinancial Auto," and NFM mortgage refinancing (Credit Plus), among other adverse actions allegedly taken against her as a result of an inaccurate Trans Union consumer report.  Trans Union served the "Causation Subpoenas" identified in Trans Union's October 2009 motion for sanctions {Dkt#18, *Exhibit B*}.

Later, however, F&M realized that Plaintiff's report contained no errors when it was published to Wachovia, CitiFinancial and to the mortgage company.  She moved *in limine*, and objected at every turn when Trans Union attempted to introduce evidence of Plaintiff's lack of creditworthiness prior to the March 2009 automobile application with Wilmington Trust.  *See*, *e.g.*, Plaintiff's Motion for New Trial respecting the Credit Plus document.  Plaintiff also wanted to exclude Trans Union from presenting evidence about Plaintiff's February 2007 application to Wilmington Trust.

---

[5]  This is not the performance one would expect from lawyers asking for the highest rates in the city.

Inexplicably, F&M introduced evidence about Cardmember Services reductions in lines of credit prior to October 2008, when Plaintiff had to admit that her Trans Union report was accurate. F&M's time (and costs) relating to the deposition of "Elan Financial" (aka Cardmember Services) in April 2010 was wasted on this discrete non-issue.

Thus, with the discrete exception of Plaintiff's March 2009 application for credit with Wilmington Trust, all of F&M's time spent on the subpoenas was, from Plaintiff's perspective, fruitless. F&M thought all of the other subpoenas were distinct at trial and even in its post-trial motion. The time wasted on these matters should be deducted from the lodestar.

Category "C.2" in *Exhibits A* and *B* total as follows:

| | |
|---|---|
| Soumilas: | − 9.20 |
| Gorski: | − 9.40 |
| Spang: | − 9.10 |

**D.    Other Redundant, Excessive or Clearly Nonrecoverable Attorney Entries Between the Commencement of the Action and the Offer of Judgment**

1.    Both Mr. Gorski and Mr. Soumilas attended the depositions of Trans Union's corporate representatives.

2.    Soumilas' search for net worth information relates to the failed punitive damages claim (and the failed attempt to use a Wall Street Journal article).

3.    Soumilas, Gorski and Spang all worked on a motion to compel discovery from Trans Union that was not filed.

4.    Ms. Spang billed for a number of meetings and for trial preparation at the same time as Messrs. Gorski and Soumilas. The entries that appear unnecessary and duplicative are identified in Category "D"; some entries that appear to be either administrative tasks (discussed in *Section E infra*) and/or duplicative are marked as "D/E."

23

Category "D" in *Exhibits A* and *B* total as follows:

> Soumilas:      − 0.80
> Gorski:        − 6.50
> Spang (see E below)

5.     Between summary judgment and the offer of judgment, but not marked on *Exhibits A* or *B*, Mr. Soumilas spent 64.1 hours; Mr. Gorski spent 40.5 hours; and Ms. Spang spent 18.6 hours.  To the extent the Court disagrees with Trans Union's analysis of the effect of the offer of judgment, Mr. Soumilas claims an additional 186.30 hours; Mr. Gorski claims an additional 35.50 hours; and Ms. Spang claims an additional 87.20 hours.  In light of F&M's conduct on August 13, 2010 as noted above, Trans Union respectfully requests that the Court apply a lodestar adjustment to these hours.  The unreliability of the billing records is clear; the Court should adjust these hours as it deems necessary.

### E.     Paralegal Time that Was In the Nature of Administrative Work Should Be Deducted From the Lodestar

Hours spent on clerical or administrative tasks are not compensable as either attorneys' or paralegals' fees.  *Disciullo v. D'Amrosio Dodge, Inc.*, 2008 U.S. Dist. LEXIS 71910, *11-12 (E.D. Pa. Sept. 16, 2008), *citing Halderman by Halderman v. Pennhurst State Sch. & Hosp.*, 49 F.3d 939, 942 (3d Cir. Pa. 1995).

Ms. Spang's time entries contain several items that are more in the nature of secretarial work, not paralegal work.  Such time is part of attorney overhead, and is not compensable.

Category "E" in *Exhibits A* and *B* below totals as follows:

> Spang:        − 29.70

**IV.      The Effect of the Offer of Judgment.**

If the relevant fee-shifting statute treats attorney's fees as part of costs, a Rule 68 offer that is more successful than the judgment is an absolute bar to costs and fees that are incurred after the offer is served.  *Marek v. Chesny,* 473 U.S. 1, 105 S. Ct. 3012 (1985).  In the instant case, the relevant statute, provides that a successful negligent FCRA plaintiff is entitled to "costs together with attorney's fees."  The question of whether this language means costs are part of fees have not been answered in this Circuit.  To the extent the Court needs to reach this question, Trans Union respectfully submits that the language "together with" instead of a simple "and" suggests that costs and fees are part of one another, and that all fees incurred after the offer of judgment should be deducted from the lodestar.[6]

However, that question need not be answered here.  One FCRA case that has addressed this issue, *Solomon v. Onyx Acceptance*, 222 F.R.D. 418, 421-22 (C.D. Ca. 2004) interpreted §1681o differently but reached the same result because "the Court ***must*** consider the results obtained by the plaintiff after he rejects a Rule 68 offer in determining the reasonableness of any fee award." (*Emphasis in original*).

> In determining what fee is reasonable [under the] circumstance[s], the district court must take into consideration the amount of the Rule 68 offer, the stage of the litigation at which the offer was made, what services were rendered thereafter, the amount obtained by judgment, and whether it was reasonable to continue litigating the case after the Rule 68 offer was made.

*Id.* (*brackets in original*), *quoting  Haworth v. State of Nevada,* 56 F.3d 1048 (9th Cir. 1995). This is entirely consistent with Supreme Court and Third Circuit authority cited above.  If not binding, then the Offer is entirely relevant to the degree of success obtained.

---

[6]      *See* Costs section *infra*, respecting F&M's argument that the offer of judgment is invalid.

In *Solomon*, the Court held that none of the time spent litigating the case after the offer was compensable because it was unreasonable to continue litigating.  Trans Union respectfully submits that the same result should obtain here.  It was not reasonable for F&M to continue litigating the case after the Rule 68 offer was made because Plaintiff had already admitted that items she identified as inaccurate were, in reality, her own responsibility.  F&M had already filed motions *in limine* admitting that Plaintiff was denied a mortgage, was denied automobile loans in 2008 because she was not creditworthy, ***not*** due to Trans Union's failure to follow reasonable procedures.  F&M prepared the summary judgment affidavit that kept the §1681i claim alive; it had to know that the credibility of future inconsistent testimony would be in doubt.

F&M also knew that the Court reserved ruling on Trans Union's motion for sanctions in January 2010.  It could have avoided these sanctions had it accepted the offer of judgment.  Had F&M asked Trans Union to settle the case for $75,000 and agree not to renew the motion for sanctions, Trans Union would have agreed.  F&M never tried to do so.

In its Fee Petition, p.6, F&M says that it billed $141,000 up to the offer of judgment. This is evidence that F&M must have expected to have full success on the §1681e(b), §1681i(a), §1681n and §1681o claims and that its fees would be justified by the verdict, despite all of the problems with the claims that F&M knew existed.  F&M knew that it had a case with an inaccurate report and a mixed file, but the mere fact that it was able to establish a negligent §1681e(b) violation does not mean that it should have expected to recover all of its fees.  "[J]ust because a plaintiff has [a statutory] violation in her pocket does not give her a license to go to trial, run up the attorney fees and then recover them from the defendant."  *Solomon* at 422 *quoting Haworth*.

By F&M's calculation that it billed $141,000 out of $229,377.50 prior to the offer, F&M asks the Court to give it 38.53% additional fees that it incurred to the benefit of no one but itself. This is unfair and unreasonable.

Of course, nothing in *Solomon*, *Haworth* or the Supreme Court or Third Circuit jurisprudence stops the Court from applying a negative multiplier to the pre-offer of judgment fees. In *Solomon*, the Court found nothing unreasonable about the plaintiff's attorney's conduct before the offer and did not apply a negative multiplier to such fees. That action was successful and the plaintiff's rights were vindicated by the parties' agreement to settle for $3,000 with attorney's fees to be determined by the court. But a 100% negative multiplier was imposed on the post-offer fees because there was no good reason why the plaintiff did not accept the offer.

Here, factors calling for a substantial negative multiplier to the pre-offer fees are present. Even if the Court does not agree with the hourly rate Trans Union proposes above; and even if the Court does not agree with all of the deductions, it was not reasonable for F&M to reject the offer. The award should reflect this.

**V.     A 95% Negative Multiplier to the Pre-Offer Fees; or a 99% Multiplier to All Fees, Is Warranted.**

As this Court held, a useful analog to determining the reasonableness of a fee would be to assume that the client had to pay the lawyer herself:

> In the most fundamental way, and by reference to the private-practice analog, no paying client could possibly consider it a victory to be charged almost $20,000 for a $3,072 recovery. ... in a case such as this, devoid of factual or legal complexity, taking less than two half-days of trial, the results of which neither affected public policy issues nor benefitted anyone other than the plaintiff, and where plaintiff's own success was limited, it is not "reasonable,"... for counsel to be awarded a lodestar more than four times the size of his client's actual recovery.

*Rainey v. PHA*, 832 F. Supp. 127, 131-132 (E.D. Pa. 1993) *quoting Farrar v. Hobby*, 506 U.S. 103, 114, 121 L. Ed. 2d 494, 113 S. Ct. 566 (1992). Here, F&M asks for almost 230 times the judgment in fees. This is beyond unreasonable. Whatever factors this Court wishes to use within its broad discretion for the negative multiplier, the negative multiplier should be extreme. Nothing about this case was novel or complex. No public policy issue was vindicated. No one but Plaintiff benefitted. The degree of success, however, was extremely limited. F&M and Plaintiff recovered much less than it was offered. They failed on three of four FCRA violations. They clearly expected at least another zero tacked onto the end of the compensatory damages award (close to *Cortez*); and they expected to see that number multiplied by nine in a punitive damages award (like in *Dixon-Rollins*). They were extremely disappointed.

The extreme negative multiplier Trans Union seeks is also justified by F&M's utter recalcitrance in the face of every defect in the case. Its refusal to bend cost Trans Union and the Court enormous amounts of time. There were false sworn interrogatories and false complaints. Plaintiff abandoned a claimed mortgage denial (the most devastating of economic injuries to a consumer), among other transactions. As *Exhibit E* shows, Plaintiff's narrative all along was that Trans Union had a problem for years. But F&M had moved *in limine* to exclude the crux of Plaintiff's case and argue that its client's own narrative was irrelevant. F&M knew all of this when it refused the offer. F&M also knew that sanctions from the subpoena objections were looming and could be avoided. Instead of conceding that the case had been compromised, F&M objected at every turn to Trans Union's plainly relevant questions on these issues.

Somehow, with F&M's assistance, Plaintiff swore she disputed more than the bankruptcy on the phone in March 2009. The claim was patently false. This is the most ineffective and

28

counterproductive assistance that an attorney could offer.  At best, F&M recklessly disregarded its own client's version of events.  At worst, it pushed her into signing a false affidavit to avoid summary judgment.  Either way, F&M's lawyers' years of experience and alleged expertise in the FCRA did not help them steer clear of the meritless §1681i claim.

This matter is an extreme example of the waste that can occur in a fee-shifting case.  It is incumbent on the plaintiff's attorney to avoid overplaying a plaintiff's hand.  F&M entirely failed in its duty to exercise billing judgment.  The negative multiplier should be exemplary. F&M deserves nothing, or the lowest amount that this Court can in its discretion award.


## VI.   COSTS

"Attorneys' fees and costs are frequently analyzed together, so the same standards apply to our review of costs as to our review of attorneys' fees."  *Loughner v. Univ. of Pittsburgh*, 260 F.3d 173, 181 (3d Cir. 2001).  However, Rule 68 plainly applies to costs, regardless of whether the FCRA fee-shifting provision includes costs as part of fees.

F&M asserts that the offer of judgment was invalid because it was made "solely to settle."  Fee Pet'n p.6.  It cites nothing for the proposition that this language invalidates the judgment.  On the contrary, it is well-established that a Rule 68 offer is solely to settle a lawsuit, not to establish constitutionally moot questions of right or wrong.  In *McCauley v. Trans Union LLC*, 402 F.3d 340, 341-342 (2d Cir. 2005), the Court held that "[D]isclaimers of liability in Rule 68 settlement offers" are allowed because:

> "a party [cannot] force his opponent to confess to having violated
> the law, as it is always open to a defendant to default and suffer

> judgment to be entered against him without his admitting anything." *Chathas v. Local 134 IBEW*, 233 F.3d 508, 512 (7th Cir. 2000).  The *Chathas* court went on to say, "if the defendant has thus thrown in the towel there is nothing left for the district court to do except enter judgment. The absence of a controversy in the constitutional sense precludes the court from issuing an opinion on whether the defendant actually violated the law." *Id.*

(*quotations, brackets in McCauley*).   In any event, no matter what language was in the offer, Plaintiff had no intention of accepting it.   It is probative to the degree of success that Plaintiff walked away from $75,000 and it is within the Court's discretion to deny post-offer costs.

F&M's Costs Chart (Dkt. #141-2, p.63) itemizes most costs, and also includes other costs (Reliable Copy Service charges) that were lumped into F&M's calculation without regard to the date.  *Exhibit A* hereto, pp.2-3, itemizes the costs so that the proper reductions may be applied.

F&M demands $3,291.40 in "Internal Copying and Scanning (16,457 at 20¢ per page primarily related to pretrial and trial activities including copying of exhibits, deposition transcripts, and other materials related to trial)."  F&M produced a screen print (Dkt#141-2 p.72) of "Total Prints: 16457" that offers no information whatsoever about the alleged copying charges.  The entire charge should be disallowed because it is not properly documented.  There is also no justification for twenty cents per page.

F&M's "Subpoena Service to Elan Financial Servs" ($75.00 on 4/1/10) and "Court Murchie deposition transcript" ($213.55 on 4/12/10) should be disallowed because they were unnecessary and/or unsuccessful.  F&M did not call Elan (aka Cardmember Service) at trial.  Mr. Murchie was a CitiFinancial witness who testified about Plaintiff's creditworthiness in March 2008, when Trans Union's report was accurate.

All of Plaintiff's costs incurred after the February 21, 2011 Offer of Judgment should be disallowed because F&M was not "successful" under Rule 68. The fees awarded to F&M should not exceed $65,000. In the alternative, the costs between March 23, 2011 and May 4, 2011 should be disallowed as unnecessary. Plaintiff did not call Court Murchie, Lovett Weems, David Briele or Catherine Ciprietti.

F&M seeks $658.10 in "External Printing, Copying and Binding" and submits bills from Reliable Copy Service in support of these costs. One invoice for $185.18 predates the Offer of Judgment. Dkt#141-2 p.73. The others, totaling $472.92, post-date the offer and are not compensable pursuant to Rule 68. *Id.* pp.74-79.

Accordingly, F&M should be awarded no more than $1,880.33 in costs.

## VII.   CONCLUSION

For the above reasons and authorities, F&M's request for $229,377.50 in fees and 7,551.48 in costs should be denied.


Respectfully submitted,

KOGAN, TRICHON & WERTHEIMER, P.C.


*/s/ Timothy P. Creech*
TIMOTHY P. CREECH
1818 Market St., 30th Floor
Philadelphia, PA 19103
(215) 575-7618; Fax: (215) 575-7688
Email: tcreech@ktwlaw.com

*Counsel for Defendant, Trans Union LLC*


DATED:       April 20, 2012

31

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

TERESA PRICE,                              )
                                           )
                                           )
                              Plaintiff,   )
                                           )
          v.                               )          C.A. No: 2:09-cv-01332-ER
                                           )
TRANS UNION LLC; and                       )
FINANCIAL RECOVERIES,                      )
                                           )
                            Defendants.    )

## CERTIFICATE OF SERVICE

I certify that I caused a true and correct copy of the foregoing Trans Union LLC's

Opposition to Plaintiff's Request for Fees to be sent on this date *via* ECF Notification to the

following ECF Registered Users:

Mark D. Mailman, Esq.
mmailman@consumerlawfirm.com, drichardson@consumerlawfirm.com

James A. Francis, Esq.
jfrancis@consumerlawfirm.com, tmassa@consumerlawfirm.com

John Soumilas, Esq.
jsoumilas@consumerlawfirm.com, dspang@consumerlawfirm.com, jsoumilas@gmail.com

Gregory J. Gorski, Esq.
ggorski@consumerlawfirm.com, dspang@consumerlawfirm.com


                              */s/ Timothy P. Creech*
                              TIMOTHY P. CREECH

DATED:        April 20, 2012